**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CNY FAIR HOUSING, INC.; THE FAIR HOUSING
PARTNERSHIP OF GREATER PITTSBURGH, INC.;
HOUSING RESEARCH & ADVOCACY CENTER, INC.,
d/b/a FAIR HOUSING CENTER FOR RIGHTS &
RESEARCH, INC.; HOUSING OPPORTUNITIES MADE
EQUAL OF BUFFALO, INC.; HOUSING
OPPORTUNITIES MADE EQUAL OF GREATER
CINCINNATI, INC.; PHYLLIS BARTOSZEWSKI; LOIS
HARTER; DEANNA TOWN,

5:21-cv-00361 (BKS/ML)

                              Plaintiffs,

v.

WELLTOWER INC.; WELLCLOVER HOLDINGS LLC;
CLOVER MANAGEMENT, INC.; CLOVER
COMMUNITIES CAMILLUS LLC; CLOVER
COMMUNITIES SALINA LLC; CLOVER
COMMUNITIES NEW HARTFORD, LLC; CLOVER
COMMUNITIES CLAY LLC; CLOVER
COMMUNITIES JOHNSON CITY, LLC; CLOVER
COMMUNITIES SOUTHWESTERN LLC; CLOVER
COMMUNITIES SWEETHOME, LLC; LACKAWANNA
SENIOR HOUSING LP,[1]

                              Defendants.

---

**Appearances:**

*For Plaintiffs:*

Conor J. Kirchner
Matthew Casey Weissman-Vermeulen
CNY Fair Housing, Inc.
731 James St., Ste. 200
Syracuse, NY 13203

---

[1] Ten other defendants who were originally named in the complaint have since been dismissed. (*See* Dkt. Nos. 17, 31). Plaintiffs voluntarily dismissed Defendant Clover Group New York prior to the filing of the motion to dismiss, and voluntarily dismissed nine other entities, including Clover Communities entities who operated apartment buildings in Ohio and Pennsylvania, following the filing of the motion to dismiss. (*Id.*). The Court has not addressed facts or arguments regarding the defendants who have been dismissed.

Reed N. Colfax
Sara K. Pratt
Relman, Colfax PLLC
1225 19th St., N.W., Ste. 600
Washington, DC 20036

*For Defendants:*

Gregory P. Photiadis
Elizabeth A. Kraengel
Duke, Holzman, Photiadis & Gresens LLP
701 Seneca St., Ste. 750
Buffalo, NY 14210

Scott M. Badami
William Christian Moffitt
Fox Rothschild LLP
10 Sentry Parkway, Ste. 200
Blue Bell, PA 19422

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiffs CNY Fair Housing, Inc.; The Fair Housing Partnership of Greater Pittsburgh, Inc.; Housing Research & Advocacy Center, Inc., d/b/a Fair Housing Center for Rights & Research, Inc.; Housing Opportunities Made Equal of Buffalo, Inc.; Housing Opportunities Made Equal of Greater Cincinnati, Inc. ("the Organizational Plaintiffs"); Phyllis Bartoszewski; Lois Harter; and Deanna Town ("the Individual Plaintiffs"), bring this action, asserting claims under the Fair Housing Act of 1968 ("FHA"), New York Human Rights Law, and Ohio Civil Rights Law.[2] (Dkt. No. 1). Defendants move to dismiss certain of Plaintiffs' claims and certain

---

[2] Plaintiffs also allege that "Defendants' long-standing and continuing practices . . .discriminate against people with disabilities in violation of the relevant federal and state fair housing laws: . . . the Pennsylvania Human Relations Act, 42 P.S. §§ 951, *et seq.*" (Dkt. No. 1, ¶ 8). However, there is no cause of action listed under Pennsylvania law, Plaintiffs make no other allegations regarding that Act, (*see id.* ¶¶ 133–139), and the parties do not address the Act in their briefing.

Defendants under Fed. R. Civ. P. 12(b)(2) and 12(b)(6) for lack of personal jurisdiction, failure

to state a claim, and lack of Article III standing. (Dkt. No. 22). Plaintiffs responded in opposition

to Defendants' motion, (Dkt. No. 27), and Defendants have replied, (Dkt. No. 34). For the

reasons below, Defendants' motion to dismiss is granted in part and denied in part.

## II.    FACTS[3]

### A.    Parties

#### 1.    Plaintiffs

The five Organizational Plaintiffs are nonprofit fair housing organizations based in New

York, Ohio, and Pennsylvania. The mission of CNY Fair Housing in Syracuse, New York is "to

ensure fair housing opportunity for all people in Central and Northern New York"; it works to

eliminate housing discrimination, including disability discrimination. (Dkt. No. 1, ¶ 11). The

mission of Housing Opportunities Made Equal of Buffalo, Inc. ("HOME of Buffalo") in Buffalo,

New York is to promote diversity and to "ensure all people have an equal opportunity to live in

the housing and communities of their choice"; it provides enforcement, education, and advocacy.

(*Id.* ¶ 14).

The mission of Housing Research & Advocacy Center, Inc., d/b/a the Fair Housing

Center for Rights & Research, Inc. ("The Fair Housing Center") in Cleveland, Ohio is to, inter

alia, "protect and expand fair housing rights" through research, educational programs, public

policy, and enforcement activities. (*Id.* ¶ 13). Housing Opportunities Made Equal of Greater

Cincinnati, Inc. ("HOME of Cincinnati") in Cincinnati, Ohio, "provides fair housing education

and enforcement throughout the Cincinnati region." (*Id.* ¶ 15). Its mission is "based on the belief

that housing is a hub of opportunity and the gateway to a better life"; it conducts enforcement

---

[3] The facts are drawn from Plaintiffs' Complaint, (Dkt. No. 1). The Court assumes that all well-pleaded facts are true and draws all reasonable inferences in Plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

and education. (*Id.*). The Fair Housing Partnership of Greater Pittsburgh, Inc. ("The Fair Housing Partnership") in Pittsburgh, Pennsylvania is "dedicated to creating and preserving equal housing choice in southwestern Pennsylvania." (*Id.* ¶ 12).

The individual Plaintiffs—Phyllis Bartoszewski, Lois Harter, and Deanna Town—are all residents of Camillus Pointe[4] Senior Apartments in Camillus, New York; they all have disabilities that affect their mobility. (*Id.* ¶¶ 16–18).

### 2.   Defendants

Welltower Inc. ("Welltower") is a Real Estate Investment Trust based in Toledo, Ohio that "invests with leading senior housing operators . . . to fund real estate infrastructure." (*Id.* ¶ 22). In July 2019, Welltower acquired "Clover Group."[5] (*Id.*). Welltower "owns and controls entities that own the senior properties at issue in this matter." (*Id.*). WellClover Holdings LLC ("WellClover") "owns and operates many of the properties in this matter." (*Id.* ¶ 23). Clover Management, Inc. is a "real estate development and management company" which manages "all of the senior properties at issue in this matter." (*Id.* ¶ 24).

Plaintiff named eight entities that own senior apartments in New York: Clover Communities Camillus LLC, which owns Camillus Pointe Senior Apartments, (*Id.* ¶ 37); Clover Communities Salina LLC, which owns Buckley Square Senior Apartments, (*Id.* ¶ 38); Clover Communities New Hartford, LLC, which owns New Hartford Square Senior Apartments, (*Id.* ¶ 39); Clover Communities Clay LLC, which owns Morgan Square Senior Apartments, (*Id.* ¶ 40); Clover Communities Johnson City, LLC, which owns Reynolds Point Senior Apartments, (*Id.* ¶

---

[4] Plaintiffs occasionally refer to Camillus "Point," (*see, e.g.* Dkt. No. 1, ¶ 37), but as they use "Pointe" most often throughout the Complaint, the Court has followed suit.

[5] Plaintiffs appear to use the name "Clover Group" to refer to all of the Defendants. (Dkt. No. 1, ¶ 1). Plaintiffs allege that Welltower Inc. and WellClover Holdings LLC are the parent companies of "the Clover Group companies." (*Id.* ¶ 47).

41); Clover Communities Southwestern LLC, which owns South Pointe Senior Apartments, (*Id.*

¶ 42); Clover Communities Sweethome, LLC, which owns Sweethome Senior Apartments, (*Id.* ¶

43); and Lackawanna Senior Housing LP, which owns Orchard Place Senior Apartments, (*Id.* ¶

44).

### B.   Parking and Rental Surcharge Policies[6]

Plaintiffs allege that the "Clover Group" has purchased or developed more than 6,500

apartment units in six states and manages around 6,000 units in large apartment complexes. (*Id.* ¶

47). "Many of those complexes are specifically designated for seniors over the age of 55." (*Id.*).

Most Clover Group complexes are three-stories high and "garden style." (*Id.* ¶ 50). The

complexes are spread out, with units "dispersed over a large area." (*Id.*). Residents and visitors

who use mobility assistance devices often cannot find parking that will accommodate them, or

cannot count on having access to an accessible space or a space near their unit or an elevator. (*Id.*

¶ 49). Available spots "can be hundreds of meters from the entrance or elevator to a particular

unit." (*Id.* ¶ 50).

Clover Group has a "first-come, first-served parking policy at all of its senior living

properties," and residents "cannot have reserved or designated parking." (*Id.* ¶ 49). Residents or

applicants are sometimes told that a "reasonable accommodation for a designated parking space

could be granted," but only if they pay a $350 fee and/or provide "excessive and inappropriate"

medical documentation, when their disability and need for accommodation are "obvious." (*Id.* ¶

54).

---

[6] The Court has only briefly summarized the allegations regarding reasonable accommodations for parking spaces (including allegations regarding Plaintiff Lois Harter), which are not at issue here.

Clover Group also has a policy of adding $15–$25 to the monthly rent for first-floor units or units on the second or third floor located near an elevator. (*Id.* ¶ 55). People with mobility disabilities have a "disproportionate need" for these units. (*Id.*). Clover Group only applies this pricing scheme to its senior living complexes, not its family housing communities. (*Id.* ¶ 56). This extra rental payment, which is often unaffordable, is "disproportionately born" by residents with disabilities. (*Id.*). This policy has been "continuously maintained" and "unchanged" since at least 2018. (*Id.* ¶ 57).

### C.    Individual Plaintiffs

The Individual Plaintiffs live at Camillus Pointe Senior Apartments, a Clover Group senior living property located in Camillus, New York, and owned by Defendant Clover Communities Camillus LLC. (*Id.* ¶¶ 37, 58). Many Camillus Pointe residents, including the Individual Plaintiffs, have had "requests for designated parking spaces denied," and other tenants with disabilities have been told that they must "pay a rent surcharge for apartments on the first floor and for apartments near the elevator, even when the location is necessary for the residents because of their disabilities." (*Id.* ¶ 58, 82). All of the Individual Plaintiffs have mobility disabilities; all have "had their requests for reasonable accommodations denied," and, as a result, "have experienced great physical difficulty traveling to and from their apartment units." (*Id.* ¶ 58). Two of the Plaintiffs pay a monthly premium to live on the first floor. (*Id.* ¶¶ 65, 74).

### 1.    Phyllis Bartoszewski

Plaintiff Phyllis Bartoszewski is 77 years old and has lived at Camillus Pointe since 2018. (*Id.* ¶¶ 16, 59). Bartoszewski has rheumatoid arthritis, stenosis of the spine, sciatica, and pleurisy—disabilities that limit her mobility. (*Id.* ¶ 59). She has "difficulty breathing" and can only walk "seven to eight feet" without help, so she uses a cane in her home and a walker when she leaves her apartment. (*Id.*). She has had a disability parking placard issued by the DMV since

2017. (*Id.*). Her disabilities are "obvious and apparent," and she has informed Camillus Pointe staff about them. (*Id.*). Bartoszewski must park close to the main entrance of the building in order to access her apartment "without significant difficulty," however, she is only able to park in these spots "less than half the time." (*Id.* ¶ 60).

Bartoszewski asked Tanya Trice, the on-site manager at Camillus Pointe, for an assigned disability parking space within a week of moving in. (*Id.* ¶ 61). Trice told her that Camillus Pointe does not provide designated parking spots because "there were too many residents" with disabilities and "not enough spaces available." (*Id.*). In late 2018, CNY Fair Housing submitted a request on behalf of the Individual Plaintiffs, including Bartoszewski, for assigned parking spaces as reasonable accommodations for their disabilities. (*Id.* ¶ 62). Trice wrote to multiple residents, stating that they could be provided with an assigned parking space for a $350 fee. (*Id.*). Because Bartoszewski could not afford the $350 fee, she has not received a designated parking space. (*Id.* ¶ 63). She has suffered physical difficulties as a result of walking longer distances, causing "significant pain in her chest," which is "akin to that of a heart attack." (*Id.* ¶ 64).

Before Bartoszewski moved in, she had been on the waiting list for almost a year for a first-floor apartment, which would "accommodate her disabilities." (*Id.* ¶ 65). After she moved in, she was informed for the first time that her rent was $15 more than for similar units because her unit was in a "prime location" on the first floor and close to the elevator as well as the front door. (*Id.*). In July 2019, CNY Fair Housing sent a letter to Clover Group on behalf of Bartoszewski and another tenant requesting that the rent surcharge for the first-floor unit be waived because it was imposed for features that were necessary accommodations for their disabilities. (*Id.* ¶ 66). Clover Group's policy did not change, and Bartoszewski still pays a rent "surcharge" for her unit. (*Id.*).

2.     **Deanna Town**

Plaintiff Deanna Town is 74 years old and has lived in a first-floor apartment at Camillus Pointe since 2016. (*Id.* ¶¶ 18, 67). She has degenerative back problems and neuropathy in her legs, which limit her mobility and balance. (*Id.* ¶ 67). When she moved into Camillus Pointe, she used a cane as a mobility aid. (*Id.*). Since she had back surgery in 2017, she has used a "bulky wheeled walker." (*Id.*). Her disabilities are "obvious" and known to the staff of Camillus Pointe. (*Id.*).

Town has had a DMV-issued disability parking placard since the 1990's, but she does not usually use it when parking at Camillus Pointe because the accessible parking spots are located far from her apartment. (*Id.*). Town must park in one of the spaces outside of her unit in order to access it without difficulty, but she "regularly cannot obtain" one of these spaces. (*Id.* ¶ 68). When Town moved into Camillus Pointe, Operations Manager for Clover Management Debbie Kucia told her that Camillus Pointe would not provide her with designated parking. (*Id.* ¶ 69). In 2018, she was included in the letter sent by CNY Fair Housing, and her request for a designated parking space was rejected. (*Id.* ¶ 70). Because she does not have a designated parking space, Town has suffered physically and been forced to make personal changes to adjust. (*Id.* ¶ 71). In 2020, she fell in the parking lot in while trying to step onto the sidewalk on the easternmost side of the building, which does not have curb cuts, and had to go to urgent care. (*Id.* ¶ 72).

When she moved in, Town was told by a Clover employee that rent for first-floor units and units close to the elevator would be $25 a month more than other units. (*Id.* ¶ 74). Because she needed a first-floor unit due to her disabilities, she has paid this extra $25 a month ever since. (*Id.*).

### D.    Testing

Plaintiff CNY Fair Housing received complaints from residents regarding disability

discrimination by Clover Group, including the "unjustified denial and conditioning of requests

for reasonable accommodations." (*Id.* ¶ 83). It then opened an investigation, using testers, which

are "persons presenting as people with disabilities or representing people with disabilities." (*Id.* ¶

84). These testers requested information about renting an apartment and whether designated or

reserved parking was available. (*Id.*).

In 2018 and 2019, CNY Fair Housing had testers contact Clover properties in New York,

including New Hartford Square, Morgan Square Apartments, Buckley Square Apartments, and

Reynolds Pointe Senior Apartments. (*Id.* ¶¶ 85–88). Property managers or "Clover"

representatives told the testers that there would be an extra charge for a first-floor unit, or a unit

located near the elevator. (*Id.*).

HOME of Buffalo sent testers to additional Clover properties in New York, including

Orchard Place Senior Apartments, Sweethome Senior Apartments, and South Pointe Senior

Apartments. (*Id.* ¶¶ 89–91). Property managers of "Clover representatives" informed the testers

that there would be an extra fee for an apartment on the first floor or near the elevator, and that

this fee could not be waived in light of a disability. (*Id.*).

The Fair Housing Partnership had testers contact Clover Group senior properties located

in western Pennsylvania, including Bethel Square Senior Apartments, Harbor Creek Senior

Apartments, Lafayette Square Senior Apartments, Green Ridge Senior Apartments, and Oak Hill

Senior Apartments. (*Id.* ¶¶ 92–99). "Clover representatives" informed each tester that there was

an extra fee for a first-floor unit or a unit located near the elevator. (*Id.*).

The Fair Housing Center and HOME of Cincinnati sent testers to Clover Group

properties located in Ohio, including Lorain Pointe Senior Apartments, Southpark Square Senior

Apartments, Parma Village Senior Apartments, Ivy Point Senior Apartments, Eden Park Senior Apartments, and Fairfield Village Senior Apartments. (*Id.* ¶¶ 100–105). Clover representatives informed each tester that there was an extra fee for a first-floor unit. (*Id.*).

### E.  Injury to Organizational Plaintiffs

Plaintiffs allege that Defendants' unlawful conduct, policies, and practices have frustrated and impaired the missions and purposes of the Organizational Defendants, forced them to "drain resources," and interfered with their "ability to operate." (*Id.* ¶ 110). The Organizational Plaintiffs' missions were frustrated by Defendants' interference with their "mission-related activities" and impairment of their ability to achieve their goals. (*Id.*). The Organizational Defendants have been forced to engage in "numerous activities to identify and counteract the Defendants' unlawful conduct, policies, and practices." (*Id.* ¶ 111). Each of the Organizational Plaintiffs have conducted investigations, education, outreach, and research—forcing them to divert resources from other work—in order to address and counteract the effects of Defendants' discriminatory conduct. (*Id.* ¶¶ 112–130).

### III.  DISCUSSION

Defendants argue that: (1) Plaintiffs fail to allege a valid basis for subjecting Welltower to personal jurisdiction in New York; (2) Plaintiffs' challenge to Defendants' "dynamic rental pricing policy for 'first floor' units and units located 'near an elevator'" should be dismissed because landlords need not provide "economic accommodations" to "remedy [a plaintiff's] economic status," and (3) that the Ohio, Pennsylvania and Buffalo, New York nonprofit entities lack standing because they have not alleged injuries in this district. (Dkt. No. 22-3, at 18–27).

A.     **Personal Jurisdiction**

1.     **Standard of Review**

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Entm't, Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). When the issue of personal jurisdiction is decided "on the pleadings and without discovery, the plaintiff need show only a prima facie case." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). A prima facie showing "must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). The plaintiff's allegations must provide "factual specificity necessary to confer jurisdiction." *Jazini ex rel. Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998). Conclusory statements, including legal conclusions, without supporting facts are insufficient. *Id.* "A plaintiff can make this showing through his own affidavits and supporting materials containing an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendants." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2008) (internal citations and quotation marks omitted).

In reviewing a Rule 12(b)(2) motion, the Court "may refer to evidence outside the pleadings." *Shepherd v. Annucci*, 921 F.3d 89, 95 (2d Cir. 2019). "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) (citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985)); *see Dorchester Fin. Sec., Inc. v.*

*Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (declining to adopt a standard wherein if a defendant rebuts a plaintiff's unsupported allegations with "direct, highly specific testimonial evidence regarding a fact essential to jurisdiction," the "allegation is deemed refuted").

### 2. Welltower Inc.[7]

Plaintiffs allege that Welltower Inc. ("Welltower") is a Real Estate Investment Trust based in Toledo, Ohio. (Dkt. No. 1, ¶ 22). Plaintiffs do not allege or provide documentation regarding Welltower's state of incorporation; Defendants have submitted a sworn declaration from the Vice President–Legal of Welltower, Megan M. Wolfinger, in which she attests that Welltower is a Delaware corporation with a principal place of business in Toledo, Ohio. (Dkt. No. 22-2, ¶ 2).

Plaintiffs allege that Welltower "owns and controls the entities that own the senior properties at issue in this matter," that Welltower is one of the "parent companies" of the "Clover Group companies." (Dkt. No. 1, ¶¶ 1, 22, 47). Plaintiffs allege that Welltower "acquired Clover Group in July 2019." (*Id.* ¶ 22). According to the Complaint, "Clover Group" includes all of the Defendants. (*Id.* ¶ 1)

Plaintiffs submitted a news article dated August 14, 2019, from *Senior Housing News*, which states that: "In a $343 million transaction announced in late July, Toledo, Ohio-based Welltower acquired a portfolio of 32 Clover communities," and that Clover is now "backed by Welltower and also private equity giant The Carlyle Group." (Dkt. No. 27-3, at 2–3). Plaintiffs also submitted Welltower's "4Q19 Earnings Release," dated February 12, 2020, which indicates

---

[7] Defendants have withdrawn their request to dismiss WellClover Holdings LLC (WellClover) for lack of personal jurisdiction, (Dkt. No. 34, at 9 n.3). They argue, in the footnote withdrawing that request, that Defendants Clover Communities Clay LLC, Clover Communities Salina LLC, and Lackawana Senior Housing LP should be dismissed because they merged into WellClover in 2019, and "no longer exist." (*Id.*). Seeing no allegations or other evidence in the record regarding this merger, the Court declines to address that request.

that Welltower had "[i]nitiated new relationships with . . . Clover Management," and "formed a new joint venture partnership with Buffalo, New York-based Clover Management." (Dkt. No. 27-4, at 4, 6).

Defendants, on the other hand, have submitted two declarations in support of their motion to dismiss. First, the Vice President–Legal of Welltower, Megan Wolfinger, attests that Welltower "does not own, operate, or control any of the properties described in the Complaint," and that Welltower is not "the corporate parent" of any of the Clover defendants listed in the Complaint. (Dkt. No. 22-2, ¶¶ 4–5). Wolfinger explains that Welltower "owns a partial interest in Well Ibis Portfolio Member, LLC, which in turn, is partial owner of WellClover Venture, LLC[, which,] in turn, has an ownership interest in the entities that own the senior properties described in the Complaint." (*Id.* ¶ 6). Second, Defendants submitted a sworn affidavit from the Executive Vice President of Clover Management, Inc., Richard Greenspan, who attests that Welltower is not the "corporate parent" of Clover Management, Inc., and that Welltower does not "own or control" Clover Management, Inc. (Dkt. No. 22-1, ¶¶ 5–6).

### 3. Discussion

Defendants argue that the court lacks both general and specific jurisdiction over Welltower. (Dkt. No. 22-3, at 19–21). Defendants argue that Welltower does not "own[] and control[] entities that own the senior properties at issue in this matter," and, in any event, "the mere existence of a parent-subsidiary relationship between two corporate entities is insufficient to convey personal jurisdiction over a corporate parent." (*Id.* at 18–19).

Plaintiffs do not contest the lack of general jurisdiction,[8] but argue that the Court may exercise specific jurisdiction. (Dkt. No. 27, at 9–11). Plaintiffs assert that they are not relying

---

[8] Plaintiffs have not asserted any basis alleged for general jurisdiction over this corporation. In *Daimler AG v. Bauman*, the Supreme Court clarified that the two paradigm bases of general jurisdiction for a corporation are its place of

merely on a parent-subsidiary relationship, but the fact that Welltower "owns and controls entities that operate properties in New York . . . where housing discrimination is occurring," (*id.* at 12), and Welltower's ownership interest and control over the entities in New York is "sufficient to create specific jurisdiction over Welltower in relation to Plaintiffs' claims challenging that discrimination," (*id.* at 11 (citing *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)). Plaintiffs argue that Welltower's failure to "modify or eliminate the discriminatory policies" as an owner with control over the subject New York properties, confers specific jurisdiction, and that it would be vicariously liable for the acts of its agents under fair housing laws. (*Id.*).

Defendants respond that this Court lacks specific jurisdiction over Welltower for "three reasons." First, Plaintiffs used improper "group pleading," lumping together Welltower, WellClover, Clover Group Inc., Clover Group New York LLC, and Clover Group Management, Inc., and failing to set forth any facts as to Welltower itself. (Dkt. No. 34, at 7). Second, the presence of a subsidiary in a state does not establish its parent company's presence in the state, unless the subsidiary is an "agent" or "mere department" of the parent company, and allegations that a subsidiary is "owned and controlled" by a parent are insufficient to establish that the subsidiary is an "agent" or "mere department." (*Id.* at 8). Third, Plaintiffs cited no case law holding that Welltower is subject to personal jurisdiction simply because fair housing laws would impose vicarious liability. (*Id.*).

Even construing Plaintiffs' allegations in their light most favorable to them and construing all doubts in their favor, for the following reasons, the Court finds that Plaintiffs have

---

incorporation and its principal place of business, and only "in an exceptional" case would it also be at home in another forum. 571 U.S. 117, 139 n.19 (2014); *see Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("*Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases.").

failed to make a prima facie showing that this Court may exercise specific personal jurisdiction over Welltower.

### a.       Specific Jurisdiction

"Specific [personal] jurisdiction exists when 'a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673–74 (2d Cir. 2013) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 567–68) (internal quotation omitted). "In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, we look to the law of the forum state to determine whether a federal district court has personal jurisdiction over a foreign corporation." *Brown*, 814 F.3d at 624; *see also U.S. Bank Nat'l Assoc. v. Bank of Am. N.A.*, 916 F.3d 143, 149 (2d Cir. 2019) ("To determine personal jurisdiction, a federal court applies the long-arm statute of the state in which it sits." (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010))). Neither of the parties have provided any briefing on the applicable issue here—whether New York State's long arm statute (CPLR § 302(a)(1) (transaction of business within the state), § 302(a)(2) (commission of a tortious act within the state), and § 302(a)(3) (commission of tortious acts without the state causing injury within the state)), provides a statutory basis for exercising specific jurisdiction. The Court finds that it does not.

### i.       Transacting Business–CPLR 302(a)(1)

CPLR § 302(a)(1) permits the exercise of jurisdiction over a nondomiciliary when the claim arises from the "transact[ion of] any business within the state or contract[ ] anywhere to supply goods or services in the state." A finding of jurisdiction under this provision requires a showing that: (1) a defendant "transacts any business" in New York; and (2) the claim "arises from" such transaction. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). A

defendant transacts business if it is engaged in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York]." *Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830, 834 (N.Y. 2007) (alteration in original) (quoting *McKee Elec. Co. v. Rauland-Borg Corp.*, 229 N.E.2d 604, 607 (N.Y. 1967)). Such "purposeful availment occurs when the non-domiciliary 'seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship.'" *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 78 N.E.3d 1172, 1176 (N.Y. 2017) (quoting *Paterno v. Laser Spine Inst.*, 23 N.E.3d 988, 993 (N.Y. 2014)). At a minimum, the defendant must, on its "own initiative," project itself into the state to engage in a "sustained and substantial transaction of business." *Fischbarg v. Doucet*, 880 N.E.2d 22, 28 (N.Y. 2007) (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506, 508 (N.Y. 1970)). "It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (citing *Daimler AG*, 571 U.S. at 135 n.13 (2014)).

Here, even crediting their allegations and supporting materials, Plaintiffs have not made a prima facie showing that this provision provides a statutory basis for personal jurisdiction. "[E]ven a formal parent-subsidiary relationship or a 'dominated affiliate' relationship will only allow for the exercise of personal jurisdiction by association if the subsidiary or affiliate is 'either an 'agent' or a 'mere department' of the foreign parent . . .'" *SPV Osus Ltd. v. UniCredit Bank Austria*, No. 18-cv-3497, 2019 WL 1438163, at *8, 2019 U.S. Dist. LEXIS 55713, at *24–25 (S.D.N.Y. Mar. 30, 2019) (first citing *Jazini*, 148 F.3d at 184; and then citing *SPV OSUS Ltd. v. AIA LLC*, No. 15-cv-619, 2016 WL 3039192, at *4 n.5, 2016 U.S. Dist. LEXIS 69349, at *9 n.5 (S.D.N.Y. May 26, 2016)). "As the Second Circuit has held, 'sparse allegations of agency . . .

are too conclusory to make a *prima facie* showing of personal jurisdiction.'" *Id.* (citing *Charles Schwab Corp.*, 883 F.3d at 86). In determining whether an agency relationship exists for the purposes of extending personal jurisdiction, courts look to whether "the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab Corp.*, 883 F.3d at 85 (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)) (internal quotation marks omitted); *see also Erick Van Egeraat Associated Architects B.V. v. NBBJ LLC*, No. 08-cv-7873, 2009 WL 1209020, at *2, 2009 U.S. Dist. LEXIS 42385, at *5–6 (S.D.N.Y. Apr. 29, 2009) ("A foreign corporation may be subject to personal jurisdiction in New York based on the presence and activities here of an affiliated entity when either the New York entity 'renders services on behalf of the foreign corporation that . . . are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available . . . or the New York entity is so fully controlled by the foreign one as to be a 'mere department' of it." (citing *Beech Aircraft*, 751 F.2d at 120)). "In addition . . . courts have looked to the financial interdependence of the entities, the degree to which the parent company interferes in the selection and assignment of the subsidiary's personnel and fails to observe corporate formalities, and the extent to which the parent exercises control over the marketing and operational policies of the subsidiary." *Id.* at *2, 2009 U.S. Dist. LEXIS 42385, at *5–6 (citing *Beech Aircraft*, 751 F.2d at 120–22).

Here, Plaintiffs have not alleged, or submitted supporting materials showing, that any New York entities at issue could be said to be either an "agent" or "mere department" of Welltower. Plaintiffs allege that Welltower "owns and controls entities that own the senior properties at issue" and that Welltower is a "parent company" of the "Clover Group" companies. Plaintiffs also provided documents indicating that Welltower "acquired a portfolio of 32 Clover

17

communities," that "Clover" is "backed by Welltower," and that Welltower had "formed a new joint venture partnership with Buffalo, New York-based Clover Management." But Plaintiffs do not allege that any New York entity acted for Welltower's benefit, or that Welltower knew or consented to these actions, and offer no allegations regarding "the financial interdependence" of Welltower and any Clover entity, the degree to which Welltower "interferes" in the selection and assignment of personnel at these entities, or the extent to which Welltower exercises control over their operational policies. Again, "sparse allegations of agency . . . are too conclusory to make a *prima facie* showing of personal jurisdiction." *Charles Schwab Corp.*, 883 F.3d at 85–86. Plaintiff's argument that fair housing laws would hold Welltower "vicariously liable" for the acts of its agents is of no avail: Plaintiffs have failed to plausibly plead that any New York entity could be said to be Welltower's "agent." (Dkt. No. 27, at 11). Therefore, Plaintiffs have not met their burden to demonstrate that this Court has the statutory authority to exercise specific personal jurisdiction over Welltower under CPLR § 302(a)(1). *See Troma Entm't, Inc.*, 729 F.3d at 217 ("A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit.") (internal quotations omitted) (quoting *Penguin Grp. (USA) Inc.*, 609 F.3d at 34).

### ii.     Tortious Act Within State–CPLR § 302(a)(2)

CPLR § 302(a)(2), in relevant part, provides for jurisdiction when the claim arises from a defendant's "commi[ssion of] a tortious act within the state." A "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999); *see also Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 803 (S.D.N.Y. 2015) (remarking that "the Second Circuit continues to adhere to the traditional, stricter rule . . . requiring the defendant to physically commit the tortious act within New York"), *aff'd*, 660 F. App'x 43 (2d Cir. 2016) (summary order). Here,

CPLR § 302(a)(2) does not provide a statutory basis for specific personal jurisdiction: there are no allegations that Welltower committed a tortious act while "physically present" in New York.

### iii.       Injury Within State–CPLR § 302(a)(3)

Under CPLR § 302(a)(3), a court may exercise specific jurisdiction over a defendant when the action arises from the defendant's "commission of a tortious act without the state causing injury to person or property within the state," as long as the defendant: (i) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state"; or (ii) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Plaintiffs have not provided any facts that would indicate that CPLR § 302(a)(3) provides a statutory basis for specific personal jurisdiction.[9]

### B.       Failure to Accommodate: Monthly Rent for More Accessible Units

Defendants next argue that the Court should dismiss Plaintiffs' claims arising from Defendants' alleged "failure to accommodate by charging lower rent" because the FHA does not require "economic accommodations." (Dkt. No. 22-3, at 22). Plaintiffs respond that Defendants' argument has "no legal basis," and that courts have "recognized that the FHA's reasonable accommodation provision may require exceptions to a policy where the disability-related impact of the policy is financial in nature." (Dkt. No. 27, at 14–15).

---

[9] Because the Court finds no statutory basis under New York's long-arm statute to exercise specific personal jurisdiction over Welltower, it need not address whether doing so would comport with the requirements of due process. Furthermore, as no party has requested further jurisdictional discovery, and because Plaintiffs have failed to make a prima facie showing of personal jurisdiction, the Court will not grant jurisdictional discovery. *See Jazini*, 148 F.3d at 186.

"A plaintiff may establish discrimination under the FHA under one of three theories: disparate treatment, disparate impact, or failure to make reasonable accommodations." *Hevner v. Village East Towers, Inc.*, No. 06-cv-3983, 2011 WL 666340, at *2, 2011 U.S. Dist. LEXIS 12579, at *5 (S.D.N.Y. Feb. 7, 2011) (citing *Reid v. Zackenbaum*, No. 05-cv-1569, 2005 WL 1993394, at *3, 2005 U.S. Dist. LEXIS 17177, at *7 (E.D.N.Y. Aug. 17, 2005)), *aff'd* 471 F. App'x 73 (2d Cir. 2012) (summary order).[10] To state a claim for failure to make reasonable accommodations, a plaintiff must establish: "(1) that she is handicapped within the meaning of § 3602(h) and defendant knew or should have known of this fact; (2) that an accommodation is necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (3) that such accommodation is reasonable; and (4) that the defendant refused to make the requested accommodation." *Id.* (citing *Echeverria v. Krystie Manor, LP*, No. 07-cv-1369, 2009 WL 857629, at *6, 2009 U.S. Dist. LEXIS 27353, at *19 (E.D.N.Y. Mar. 30, 2009)).

Defendants rely primarily on *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998). In *Salute,* the plaintiffs, who were disabled, argued that the FHA required the landlord, who did not, with the exception of preexisting tenants, participate in the Section 8 program, to accept their Section 8 housing certificates in order to accommodate their disabilities. *Id.* at 296. The Second Circuit rejected this argument, explaining that that the landlord's participation in the Section 8 program was not an accommodation within the meaning of the FHA. *Id.* at 302. The Circuit noted that, ordinarily, the "duty to accommodate is shaped by the

---

[10] The Complaint alleges discrimination under the FHA for refusing to make a reasonable accommodation (42 U.S.C. §§ 3604(f)(1) and (f)(3)(B)); discriminating in the terms, conditions or privileges of rent (42 U.S.C. §§ 3604(f)(2) and (f)(3)(B)); and statements indicating a preference, limitation or discrimination based on disability (42 U.S.C. § 3604(c)). (Dkt. No. 1, ¶ 134). Defendants soley moved to dismiss the claims arising from a failure to provide a reasonable accommodation by charging lower rent for an accessible apartment unit. (Dkt. No. 22-3, at 22–24). The Complaint also alleges a violation of New York Human Rights Law and the Ohio Civil Rights Act, but the parties have only addressed the law under the FHA, and the Court has, accordingly, limited its analysis to the FHA.

handicap," because "it is the handicap that is accommodated." *Id.* at 301. The Circuit therefore found that because the plaintiffs were not seeking "an accommodation that meets and fits their particular handicap," but rather were seeking to use the FHA "to remedy economic discrimination of a kind that is practiced without regard to handicap," their FHA claim failed. *Id.* at 301–02. The Circuit concluded that "[e]conomic discrimination—such as the refusal to accept Section 8 tenants—is not cognizable as a failure to make reasonable accommodations, in violation of § 3604(f)(3)(B)." *Id.* at 302.

Here, unlike *Salute*, Plaintiffs seek an accommodation directly related to their disabilities; that is, a waiver of the $15–$25 monthly charge for an apartment on the first floor or near the elevator, in order to accommodate their mobility disabilities. (Dkt. No. 1, ¶¶ 66, 74). In other words, Plaintiffs assert that to obtain an accommodation, they are being forced to take on an additional rental expense. For example, Plaintiffs allege that after moving into Camillus Pointe, Bartoszewski, whose rheumotological and orthopedic conditions affect her mobility and ability to breathe, was informed that "her rent was $15.00 higher than similar units because the accessible unit was in a prime location on the first floor close to the elevator." (*Id.* ¶¶ 16, 65). In July 2019, CNY Fair Housing sent a letter to Clover Group requesting that this "rent surcharge" be waived "because it was being imposed for features of the apartment that were necessary to accommodate Ms. Bartoszewski." (*Id.* ¶ 66). Clover Group declined to waive this fee, and Bartoszewski continues to pay it. (*Id.*). Plaintiffs further allege that when a tester contacted South Pointe Senior Apartments in Hamburg, New York, an on-site agent told the tester that "first-floor units were an additional $25.00 per month." (*Id.* ¶ 91). When the tester asked whether the fee could be waived "because of his mother in law's disability," the agent replied that "there was no wiggle room to waive the fee." (*Id.*).

These facts are analogous to those in *Bentley v. Peace & Quiet Realty 2 LLC*, where a cancer patient, who lived on the top floor of a four-story walk-up and had trouble climbing stairs, sought, as an accommodation, to rent a vacant first-floor apartment at her current rental rate with a waiver of the 20% rent increase permitted under rent stabilization laws. 367 F. Supp. 2d 341, 342–45 (E.D.N.Y. 2005). The court noted that this was an accommodation that "directly relate[d] to her handicap, specifically her inability to walk up and down the stairs to her apartment unit," and rejected the defendants' argument based on *Salute*. *Id.* at 347. The court found that the plaintiff was seeking "an accommodation for her disability without being forced to assume additional rental expenses," and that this was "exactly the type of accommodation that falls with the purview of the [Fair Housing Amendments Act of 1988]."[11] *Id.*; *see also Martinez by Martinez v. Lexington Gardens Assocs.*, 336 F. Supp. 3d 270, 282 n.5 (S.D.N.Y. 2018) (finding request for family member to live with disabled plaintiff to assist with her care was "distinguishable from the so-called 'economic accommodation' cases, which hold that an accommodation is not necessary to afford a disabled person access to equal housing opportunity when the accommodation sought does not directly ameliorate an effect of the disability") (citations omitted); *Hubbard v. Samson Mgmt. Corp.*, 994 F. Supp. 187, 190–91 (S.D.N.Y. 1998)

---

[11] The Fair Housing Amendments Act of 1988 ("FHAA"), Pub.L. 100–430, 102 Stat. 1619, "expanded the FHA by including handicapped persons in those classes protected from discrimination in housing." *Samuelson v. Mid-Atlantic Realty Co., Inc.*, 947 F. Supp. 756, 759 (D. Del. 1996).

Although Defendants argue that the court in *Bentley* noted that ordinarily, landlords of rent-stabilized buildings are not required to forgo the opportunity for a vacancy increase merely because a disabled person seeks to inhabit the unit absent "special circumstances," this does not affect the Court's analysis. This language in *Bentley* was part of the court's *reasonableness* analysis, which is a "separate question" from whether a requested accommodation is "cognizable." *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1159 (9th Cir. 2003). Defendants have not challenged the reasonableness of the requested waiver, but rather, whether it is cognizable under the FHA. A reasonableness analysis is typically not appropriate at the motion to dismiss stage. *See Samuelson*, 947 F. Supp. at 762 ("It is important to note what this Court has not held. It has not decided the issue of whether Mid–Atlantic has failed to reasonably accommodate Samuelson. Such a fact-intensive inquiry is not suited for the procedural posture of a motion to dismiss.").

(granting summary judgment to plaintiffs requesting waiver of the typical fee for a reserved parking space close to her building as a reasonable accommodation, reasoning that that "[i]f the paucity of available unreserved parking near her apartment meant that [plaintiff], due to her handicap, experienced greater discomfort and difficulty than other tenants in going to and from her car, then [defendant] should have accommodated her disability by providing her, without charge, a parking space close to her building"); *Samuelson v. Mid-Atlantic Realty Co.*, 947 F. Supp. 756, 761 (D. Del. 1996) (finding that a tenant claiming that his landlord unreasonably assessed rent and late charges after he was forced to terminate his lease early due to his mental health condition had stated a claim for relief under the FHAA, noting that "[i]t is clear that generally applicable fees . . . can interfere with the use and enjoyment of housing by the handicapped" (citing H.R. Rep. No. 711, at 25)).

This case is distinguishable from cases cited by Defendants in which courts have found that an accommodation that did not directly relate to a disability was not cognizable. In *Marks v. BLDG Management Co., Inc.*, for example, the plaintiff sought leave to allow a roommate to reside in her apartment while she was away from home, a request that the court found had "everything to do with [plaintiff's] pocketbook," and was not "necessary in any way to assist her in dealing with her AIDS-related medical condition, or even that it mitigated in any way the difficulties associated with her illness." No. 99-cv-5733, 2002 WL 764473, at *4–8, 2002 U.S. Dist. LEXIS 7506, at *22–23 (S.D.N.Y. Apr. 26, 2002), *aff'd* 56 F. App'x 62 (2d Cir. 2003) (summary order). In *Hevner v. Village East Towers, Inc.*, the plaintiff requested reduced maintenance fees, waiver of arrears, and "skewed rent" because of "the financial strain her depression causes." No. 06-cv-3983, 2011 WL 666340, at *2, 2011 U.S. Dist. LEXIS 12579, at *5–6 (S.D.N.Y. Feb. 7, 2011). The court found that these requests would only "remedy her

economic status," and not "provide her with reasonable accommodations," which was insufficient to state a claim under the FHAA. *Id.*

Here, Plaintiffs seek "an accommodation for [their] disabilit[ies] without being forced to assume additional rental expenses," just as in *Bentley*. Thus, the Court does not find that this requested relief is not cognizable under the FHA as a so-called "economic accommodation," and declines to dismiss Plaintiffs' claims on that ground.

### C.     Article III Standing[12]

Defendants argue that the claims alleged by The Fair Housing Partnership, The Fair Housing Center, and HOME of Cincinnati[13] should be dismissed for lack of "organizational standing" to assert claims against the "New York Owners" because any alleged damage they suffered as a result of their investigation regarding the Defendants occurred outside of the Northern District of New York. (Dkt. No. 22-3, at 24–27). Plaintiffs respond that Defendants have "misleadingly combine[d] standing and jurisdictional analyses," and that the three out-of-state organizations have "sufficiently alleged injuries to give them standing to sue the entities responsible." (Dkt. No. 27, at 21–23).

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies,'" and "'[o]ne element of the case-or-controversy requirement is that plaintiffs must establish they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation and internal quotation marks omitted). To establish standing, "the plaintiff must

---

[12] The Court has not addressed other arguments that the Defendants made for the first time in their reply brief, including Defendants' challenge to the group pleading allegations. *See Alford v. City of N.Y.*, 413 F. Supp. 3d 99, 108–09 (E.D.N.Y. 2018) ("It is well-established that '[a]rguments may not be made for the first time in a reply brief'" and "[n]ew arguments first raised in reply papers in support of a motion will not be considered."). The Court has thus not addressed whether the out-of-state Plaintiffs have a viable cause of action against any of the remaining Defendants.

[13] Defendants also briefly state that the Court should "dismiss the claims alleged by . . . HOME of Buffalo against any other Defendants for lack of organizational standing," without further argument. (*See* Dkt. No. 22-3, at 27). In any event, in light of this ruling, the Court need not address claims by HOME of Buffalo.

have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v.*

*Robins*, 578 U.S. 330, 338 (2016). To establish organizational standing, an "organization itself

'must meet[] the same standing test that applies to individuals.'" *N.Y. Civ. Liberties Union v.*

*N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011) (citations and internal quotation marks

omitted). "Standing under the [FHA] is as broad as Article III permits." *Mhany Mgmt., Inc. v.*

*Cnty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016).

  "For federal courts to have jurisdiction" over a party's claims, however, "only one named

plaintiff need have standing with respect to each claim." *Comer v. Cisneros*, 37 F.3d 775, 788

(2d Cir. 1994) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263–

64 (1977)). "It is well settled that where . . . multiple parties seek the same relief, 'the presence

of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109

(2d Cir. 2017) (quoting *Rumsfeld v. Forum Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2

(2006)). In *Centro*, for example, the Second Circuit held that where one plaintiff/organization

had standing to bring a First Amendment challenge to a local ordinance, that was "a sufficient

predicate for federal jurisdiction," and the court did not need to reach whether the second

plaintiff /organization had standing. 868 F.3d at 109; *see also Rural & Migrant Ministry v.*

*United States Environmental Protection Agency*, 510 F. Supp. 3d 138, 155 (S.D.N.Y. 2020).

  Here, Defendants recognize that "organizations that have conducted investigations into

alleged violations of the FHA have suffered an injury-in-fact and have standing under the

statute." (Dkt. No. 22-3, at 25 (citing *Fair Housing Justice Ctr., Inc. v. Cuomo*, No. 18-cv-3196,

2019 WL 4805550, at *7, 2019 U.S. Dist. LEXIS 170119, at *17 (S.D.N.Y. Sept. 30, 2019)).

The Organizational Plaintiffs allege that their injuries were caused by the discriminatory practices at the Clover Group properties they investigated. (Dkt. No. 1, ¶¶ 109–132). Defendants have not argued that any claim lacks a plaintiff with standing to assert it. Their motion is based on an assertion that the out-of-state organizations do not have standing to bring claims based on injuries that occurred in Pennsylvania or Ohio. (Dkt. No. 22-3, at 26). Defendants have, however, failed to cite to any caselaw support for that argument.[14] Plaintiffs argue that "fair housing organizations from different states are routinely permitted to challenge multistate injuries caused by a consistent set of national discriminatory practices implemented or enforced by a single company or family of companies." (Dkt. No. 27, at 24 (citing, inter alia, *Nat'l Fair Hous. Alliance v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 625–27 (D. Md. 2019) (finding that "fair housing groups from around the country" had standing over FHA claims filed in Maryland against the defendants, even though some organizations did not conduct investigations in Maryland))); *see also Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, No. 18-399, 2020 WL 4050243, at *6, 2020 U.S. Dist. LEXIS 127000, at *17 (E.D. La. July 17, 2020) (noting that "[t]here is no geographical requirement in the standing analysis; thus, a plaintiff need not file suit in the place where the complained-of injury occurred"). Having found no support for Defendant's argument, the Court declines to dismiss claims raised by The Fair Housing Center, The Fair Housing Partnership, or HOME of Cincinnati for lack of standing.

## IV.   CONCLUSION

For these reasons, it is hereby

---

[14] The case of *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) is inapposite. In *Mahon*, the Second Circuit affirmed the dismissal of *defendants* who had not caused any injury to the plaintiff; the court rejected the plaintiff's argument that it could bring an action "against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff."

**ORDERED** that Defendants' motion to dismiss Defendant Welltower, Inc. for lack of personal jurisdiction (Dkt. No. 22) is **GRANTED** and Defendant Welltower, Inc. is **DISMISSED without prejudice** for lack of personal jurisdiction; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 22) is otherwise **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated:   February 28, 2022
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge