**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CNY FAIR HOUSING, INC.; THE FAIR HOUSING
PARTNERSHIP OF GREATER PITTSBURGH, INC.;
HOUSING RESEARCH & ADVOCACY CENTER, INC.,
d/b/a FAIR HOUSING CENTER FOR RIGHTS &
RESEARCH, INC.; HOUSING OPPORTUNITIES MADE
EQUAL OF BUFFALO, INC.; HOUSING
OPPORTUNITIES MADE EQUAL OF GREATER
CINCINNATI, INC.; PHYLLIS BARTOSZEWSKI;
DEANNA TOWN; and JOYCE WILCOX, as administrator
and representative of the estate of Lois Harter,

        5:21-cv-361 (BKS/ML)

                    Plaintiffs,

v.

WELLCLOVER HOLDINGS LLC; CLOVER
MANAGEMENT, INC.; CLOVER COMMUNITIES
CAMILLUS LLC; CLOVER COMMUNITIES SALINA
LLC; CLOVER COMMUNITIES NEW HARTFORD,
LLC; CLOVER COMMUNITIES CLAY LLC; CLOVER
COMMUNITIES JOHNSON CITY, LLC; CLOVER
COMMUNITIES SOUTHWESTERN LLC; CLOVER
COMMUNITIES SWEETHOME, LLC; and
LACKAWANNA SENIOR HOUSING LP,[1]

                    Defendants.

---

**Appearances:**

*For Plaintiffs:*

Conor J. Kirchner
Matthew Casey Weissman-Vermeulen

---

[1] Eleven other defendants who were originally named in the Complaint have since been dismissed. Plaintiffs voluntarily dismissed one entity—Clover Group New York LLC—before Defendants filed their motion to dismiss and voluntarily dismissed nine other entities—Clover Group, Inc.; Clover Communities Olmsted Falls LLC; Clover Communities Lorain LLC; Clover Communities Hamilton LLC; Clover Communities Bethel Park LLC; Clover Communities North Fayette LLC; Clover Communities Scranton, LLC; Clover Communities Harborcreek, L.P.; and Clover Communities Taylor LLC—after Defendants filed their motion to dismiss. (*See* Dkt. Nos. 17, 31). One more entity—Welltower, Inc.—was later dismissed in accordance with the Court's February 28, 2022 Decision. *CNY Fair Hous., Inc. v. Welltower Inc.*, 588 F. Supp. 3d 282, 300 (N.D.N.Y. 2022). The Court has not addressed facts or arguments regarding the defendants who have been dismissed.

CNY Fair Housing, Inc.
731 James St., Ste. 200
Syracuse, NY 13203

Soohyun Choi
Reed N. Colfax
Gabriel Diaz
Sara K. Pratt
Relman, Colfax PLLC
1225 19th St., N.W., Ste. 600
Washington, DC 20036

*For Defendants:*

Gregory P. Photiadis
Elizabeth A. Kraengel
Elise L. Cassar
Duke, Holzman, Photiadis & Gresens LLP
701 Seneca St., Ste. 750
Buffalo, NY 14210


**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

Plaintiffs CNY Fair Housing, Inc. ("CNY Fair Housing"); The Fair Housing Partnership

of Greater Pittsburgh, Inc. ("Fair Housing Partnership"); Housing Research & Advocacy Center,

Inc., d/b/a Fair Housing Center for Rights & Research, Inc. ("Fair Housing Center"); Housing

Opportunities Made Equal of Buffalo, Inc. ("HOME of Buffalo"); Housing Opportunities Made

Equal of Greater Cincinnati, Inc. ("HOME of Cincinnati") (collectively, the "Organizational

Plaintiffs"); Phyllis Bartoszewski; Deanna Town; and Joyce Wilcox, as administrator and

representative of the estate of Lois Harter (collectively, the "Individual Plaintiffs"), bring this

action, asserting claims under the Fair Housing Act of 1968 ("FHA"), New York Human Rights

Law ("NYSHRL"), and Ohio Civil Rights Law. (Dkt. No. 1). Presently before the Court are the

parties' motions for partial summary judgment, (Dkt. Nos. 159, 173), which are fully briefed,

(Dkt. Nos. 173-124, 181, 183). For the following reasons, both motions are granted in part and

denied in part.

## II.     FACTS[2]

### A.     Parties

#### 1.     Plaintiffs

The five Organizational Plaintiffs are nonprofit fair housing organizations based in New

York, Ohio, and Pennsylvania. (Dkt. No. 159-2, ¶¶ 26, 35, 53; Dkt. No. 173-1, ¶¶ 26, 35, 53).

CNY Fair Housing is based in Syracuse, New York, and works to eliminate housing

discrimination, including disability discrimination. (Dkt. No. 159-2, ¶¶ 26–28; Dkt. No. 173-1,

¶¶ 26–28). Its mission is "to ensure fair housing opportunity for all people in Central and

Northern New York." (Dkt. No. 159-2, ¶ 27; Dkt. No. 173-1, ¶ 27). HOME of Buffalo is based

in Buffalo, New York, and "provides fair housing enforcement and education, as well as housing

and mobility counseling to increase access to housing opportunities in the area." (Dkt. No. 159-2,

¶ 46; Dkt. No. 173-1, ¶ 46). Its mission is to promote diversity and to "ensure all people have an

equal opportunity to live in the housing and communities of their choice." (Dkt. No. 159-2, ¶¶

46–47; Dkt. No. 173-1, ¶¶ 46–47).

Fair Housing Center is based in Cleveland, Ohio. (Dkt. No. 159-2, ¶ 40; Dkt. No. 173-1,

¶ 40). Its mission is to "protect and expand fair housing rights" "through research, educational

---

[2] The following facts are drawn from the parties' statements of undisputed material facts and responses pursuant to Local Rule 56.1 (formerly Local Rule 7.1(a)(3)), (Dkt. Nos. 173-1, 181-1, 181-36, 183-4), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein to the extent they could "be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). The facts are construed in the light most favorable to the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). That is, the facts are construed in the light most favorable to Defendants when the Court considers Plaintiffs' motion, and the facts are construed in the light most favorable to Plaintiffs when the Court considers Defendants' motion. *See Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010).

programs, public policy, and enforcement activities." (Dkt. No. 159-2, ¶¶ 40–41; Dkt. No. 173-1, ¶¶ 40–41). HOME of Cincinnati, based in Cincinnati, Ohio, "provides fair housing education and enforcement throughout the Cincinnati region." (Dkt. No. 159-2, ¶ 53; Dkt. No. 173-1, ¶ 53). Its mission is "based on the belief that housing is a hub of opportunity and the gateway to a better life"; it conducts enforcement and education. (Dkt. No. 159-2, ¶ 53; Dkt. No. 173-1, ¶ 53).

Fair Housing Partnership is based in Pittsburgh, Pennsylvania, and "dedicated to creating and preserving equal housing choice in southwestern Pennsylvania." (Dkt. No. 159-2, ¶ 35; Dkt. No. 173-1, ¶ 35). It engages in "education and advocacy, fair housing analysis, enforcement actions, outreach, training, and community organizing. (Dkt. No. 159-2, ¶ 35; Dkt. No. 173-1, ¶ 35).

Individual Plaintiffs Phyllis Bartoszewski and Deanna Town are residents of Camillus Pointe Senior Apartments in Camillus, New York; both have mobility impairments. (Dkt. No. 159-2, ¶¶ 1–4, 16–18, 22; Dkt. No. 173-1, ¶¶ 1–4, 16–18, 22). Individual Plaintiff Lois Harter was a resident of Camillus Pointe prior to her death in September 2022 and also had mobility impairments. (Dkt. No. 159-2, ¶¶ 8–11; Dkt. No. 173-1, ¶¶ 8–11). Harter was replaced in this action by her niece, Joyce Wilcox, who is the administrator and representative of Harter's estate. (Dkt. No. 159-2, ¶ 9; Dkt. No. 173-1, ¶ 9).

## 2. Defendants

Defendant WellClover Holdings LLC ("WellClover") owns fifteen senior living properties located in New York and Ohio. (Dkt. No. 173-1, ¶ 16; Dkt. No. 181-36, ¶ 16; Dkt. No. 173-14, ¶ 17). Defendant Clover Management, Inc. ("Clover Management") is a "property management company that provides property management services for multifamily apartment communities." (Dkt. No. 173-1, ¶ 17; Dkt. No. 181-36, ¶ 17; Dkt. No. 173-14, ¶ 12). Defendants Clover Communities Camillus LLC; Clover Communities Salina, LLC; Clover Communities

New Hartford, LLC; Clover Communities Clay, LLC; Clover Communities Johnson City, LLC; Clover Communities Southwestern LLC; Clover Communities Sweethome, LLC; and Lackawanna Senior Housing, L.P. are single purpose entities that own senior living properties. (Dkt. No. 173-1, ¶ 15; Dkt. No. 181-36, ¶ 15; Dkt. No. 173-23, at 2).

Twelve properties (the "Identified Properties")—Buckley Square Senior Apartments, Fairfield Village Senior Apartments, Ivy Pointe Senior Apartments, Morgan Square Senior Apartments, Orchard Place Senior Apartments, Parma Village Senior Apartments, and Southpark Square Senior Apartments, owned by WellClover[3]; Camillus Pointe Senior Apartments, owned by Clover Communities Camillus LLC; New Hartford Square Senior Apartments, owned by Clover Communities New Hartford, LLC; Reynolds Pointe Senior Apartments, owned by Clover Communities Johnson City, LLC; South Pointe Senior Apartments, owned by Clover Communities Southwestern LLC; and Sweet Home Senior Apartments, owned by Clover Communities Sweethome LLC—identified in the Complaint are owned and/or managed by named Defendants and indisputably subject to this action. (Dkt. No. 173-1, ¶¶ 23–37; Dkt. No. 181-36, ¶¶ 23–37).

Eight additional properties (the "Contested Properties")—Lorain Pointe Senior Apartments, owned by Clover Communities Lorain LLC; Olmsted Falls Senior Apartments, owned by Clover Communities Olmsted Falls LLC; Eden Park Senior Apartments, owned by Clover Communities Hamilton LLC; Bethel Square Senior Apartments, owned by Clover Communities Bethel Park LLC; Lafayette Square Senior Apartments, owned by Clover

---

[3] It appears that at one point Buckley Square Senior Apartments were owned by Clover Communities Salina LLC; Fairfield Village Senior Apartments were owned by Clover Communities Fairfield LLC; Ivy Pointe Senior Apartments were owned by Clover Communities Union LLC; Morgan Square Senior Apartments were owned by Clover Communities Clay LLC; Orchard Place Senior Apartments were owned by Lackawanna Senior Housing, L.P.; Parma Village Senior Apartments were owned by Clover Communities Parma LLC; and Southpark Square Senior Apartments were owned by Clover Communities Strongsville LLC. (Dkt. No. 173-23, at 2).

Communities North Fayette LLC; Green Ridge Senior Apartments, owned by Clover

Communities Scranton LLC; Harborcreek Senior Apartments, owned by Clover Communities

Harborcreek, L.P.; and Oak Hill Senior Apartments, owned by Clover Communities Taylor

LLC—also identified in the Complaint are owned by defendants who have been dismissed. (Dkt.

No. 173-1, ¶¶ 6–7; Dkt. No. 181-36, ¶¶ 6–7). Plaintiffs assert that these properties are managed

by Clover Management and therefore subject to this action, while Defendants contend that they

are managed by non-party Clover Management West, Inc. ("Clover Management West") and

thus beyond the scope of this case. (Dkt. No. 105-4, ¶¶ 1–14; Dkt. No. 159-2, ¶¶ 60–66; Dkt. No.

173-1, ¶¶ 6–7, 17; Dkt. No. 181-36, ¶¶ 6–7, 17).

### B.      Defendants' Reasonable Accommodation Policies and Practices

In December 2018, Defendants implemented a written Reasonable Accommodation

Policy applicable to all senior properties managed by Clover Management and Clover

Management West. (Dkt. No. 159-2, ¶ 67; Dkt. No. 173-1, ¶ 67). The 2018 Reasonable

Accommodation Policy identifies only Clover Management as "Management." (Dkt. No. 159-31,

¶ 1). It was distributed to district managers and property managers and made available to

residents upon request. (Dkt. No. 159-2, ¶ 70; Dkt. No. 173-1, ¶ 70).

The 2018 Reasonable Accommodation Policy provides that "[a]ll requests for reasonable

accommodations . . . must be made in writing" and that "[o]ral requests or requests by any other

person (i.e., family member, advocate, etc.) will not be considered." (Dkt. No. 159-2, ¶ 71; Dkt.

No. 173-1, ¶ 71; Dkt. No. 159-31, ¶ 3(a)). Residents who indicated that they wanted to request a

reasonable accommodation were given a Request for Reasonable Accommodation Form which

asks for an explanation of "why you require an accommodation," a valid state issued

handicapped parking pass if the request concerns parking, and "the name and address of the

physician treating you for the disability for which you require accommodation." (Dkt. No. 159-2, ¶ 74; Dkt. No. 173-1, ¶ 74; Dkt. No. 159-36).

From approximately 2018 to 2020, residents were required to submit all Request for Reasonable Accommodation Forms to a property manager, who would forward them to a district manager. (Dkt. No. 159-2, ¶ 76; Dkt. No. 173-1, ¶ 76). Plaintiffs assert that Defendants did not exempt residents from filling out any part of the Request for Reasonable Accommodation Form, even if the resident had an obvious disability. (Dkt. No. 159-2, ¶ 78). But Clover Management Vice President of Operations Emily Brady testified during her deposition that if a district manager received a Request for Reasonable Accommodation Form "and there's no information on the form or supporting documentation that indicated the disability one way or the other," the district manager would ask the property manager if the resident had an obvious disability, and if so, "would typically approve [the request] at that point." (Dkt. No. 159-32, at 102:22–103:8). If a resident believed their disabilities were obvious, but the property manager and the district manager disagreed, the resident would be asked to have their physician "explain the nexus between their disability and need for the reasonable accommodation." (*Id.* at 107:3–107:15).

In 2020, the process for reviewing reasonable accommodation requests changed and a regional vice president was required to review and decide all requests. (Dkt. No. 159-2, ¶ 85; Dkt. No. 173-1, ¶ 85).

In November 2022, a revised Reasonable Accommodation Policy and a revised Request for Reasonable Accommodation Form were distributed to Clover Management district managers. (Dkt. No. 159-2, ¶ 82; Dkt. No. 173-1, ¶ 82). Brady testified at her deposition that under the 2022 Reasonable Accommodation Policy all reasonable accommodation requests must still be in writing. (Dkt. No. 159-2, ¶ 84; Dkt. No. 173-1, ¶ 84). Brady further testified that property

7

managers are directed to complete Request for Reasonable Accommodation Forms with residents who need assistance. (Dkt. No. 159-32, at 104:22–105:6).

In August 2023, the Reasonable Accommodation Policy and Request for Reasonable Accommodation Form were revised again to add "Clover Management West, Inc." to the title. (Dkt. No. 159-2, ¶ 86; Dkt. No. 173-1, ¶ 86).

### 1.    Defendants' Designated Parking-Related Policies and Practices

From at least 2018 to mid-2023, parking at all Clover senior properties was provided on a first-come, first-serve basis. (Dkt. No. 159-2, ¶ 89; Dkt. No. 173-1, ¶ 89). Certain properties offer garage parking for rent, but at all other properties the only way for a resident to reserve a parking space is by requesting a reasonable accommodation. (Dkt. No. 159-2, ¶ 89; Dkt. No. 173-1, ¶ 89).

On October 31, 2018, CNY Fair Housing Investigator Casey Fitzgerald emailed Tanya Trice, Property Manager at Camillus Pointe, requesting designated parking as a reasonable accommodation on behalf of ten Camillus Pointe residents, including the three Individual Plaintiffs. (Dkt. No. 159-2, ¶ 90; Dkt. No. 173-1, ¶ 90; Dkt. No. 159-33, at 2). Fitzgerald wrote that each resident "has an obvious/known disability and/or is in possession of a 'handicapped' parking placard" and that "Clover Group's practice of charging a $350 one-time fee and/or a monthly fee for reasonable accommodations for assigned and/or accessible parking is not compliant with fair housing laws." (Dkt. No. 159-33, at 2).

Emily Brady responded to Fitzgerald's email on November 5, 2018. (Dkt. No. 159-2, ¶ 91; Dkt. No. 173-1, ¶ 91; Dkt. No. 159-34, at 2–3). She wrote that "Camillus Pointe is a senior apartment community . . . [and,] like all of our other communities, does not have assigned resident parking," but "we are willing to review any request for a reasonable accommodation. (Dkt. No. 159-34, at 2). She also wrote that "any resident who makes a request for a reasonable

accommodation must do so in writing" and "once an accommodation is approved, the Property Manager will arrange a reserved space for the resident." (*Id.*). Brady later testified at her February 23, 2023 deposition that she did not grant the residents' reasonable accommodation requests for designated parking because they did not follow the proper process. (Dkt. No. 159-2, ¶ 92; Dkt. No. 173-1, ¶ 92).

Beginning in 2018, at all Clover senior properties, residents whose requests for designated parking as a reasonable accommodation were approved were assessed a one-time fee of $250 or $350. (Dkt. No. 159-2, ¶ 106; Dkt. No. 173-1, ¶ 106). This practice was discontinued in 2022 and all residents who were charged have since been refunded. (Dkt. No. 159-11, at 168:17–169:19).

### 2.    Defendants' Rent-Related Policies and Practices

At all Clover senior properties, Defendants charge an additional amount in rent for so-called premium units. (Dkt. No. 159-2, ¶ 121; Dkt. No. 173-1, ¶ 121). From at least 2014 until December 31, 2018, this amount was $15; from January 1, 2019, to December 31, 2022, it was $25; it is now $30. (Dkt. No. 159-2, ¶¶ 122–23; Dkt. No. 173-1, ¶¶ 122–23). From at least 2016 until January 1, 2023, all units located on the first floor or near an elevator were considered premium units. (Dkt. No. 159-2, ¶ 129; Dkt. No. 173-1, ¶ 129).

Defendants have not conducted any analysis of the actual demand for different units at the senior properties. (Dkt. No. 159-2, ¶ 136; Dkt. No. 173-1, ¶ 136). But Brady has testified that "[p]remium is simply a designation we use for our rent roll purposes. Market rents for the first-floor units were changed based on supply and demand." (Dkt. 159-11, at 213:12–15). According to Brady, first-floor and near-elevator tend to be leased faster than units located elsewhere. (Dkt. No. 173-107, at 56:2–4). Michael Joseph, President of Clover Management, similarly testified at his July 31, 2023 deposition, "based on . . . feedback from managers that have been leasing

buildings for the last [fifteen] years," that the rental rate across Clover senior properties is higher for first-floor units because there is a higher demand for those units. (Dkt. No. 159-65, at 117: 3–9, 118:7–10).

Plaintiffs assert that Clover Management has a strict policy of denying any reasonable accommodation to the premium unit fee policy. (Dkt. No. 159-2, ¶ 146). Defendants maintain that all reasonable accommodation requests are considered on a case-by-case basis. (Dkt. No. 173-1, ¶ 146).

### C.   Individual Plaintiffs

#### 1.   Phyllis Bartoszewski

Plaintiff Phyllis Bartoszewski has lived in a first-floor apartment at Camillus Pointe since 2018. (Dkt. No. 159-2, ¶ 1; Dkt. No. 173-1, ¶ 1; Dkt. No. 159-4, at 22:24–23:2.). Bartoszewski has rheumatoid arthritis, stenosis of the spine, sciatica, and pleurisy—disabilities that limit her mobility. (Dkt. No. 159-2, ¶ 2; Dkt. No. 173-1, ¶ 2; Dkt. No. 159-4, at 16:16–17:3, 28:10–29:25.). She has "difficulty breathing" and can only walk short distances without help, so she uses either a cane or a walker. (Dkt. No. 159-4, at 30:2–34:15). It is "very difficult for [her] to go upstairs and downstairs." (*Id.* at 77:14–18).

Bartoszewski testified that shortly after she moved to Camillus Pointe she asked property manager Tanya Trice for a designated parking space. (*Id.* at 77:23–78:16). According to Bartoszewski, Trice responded, "'[e]verybody here is handicapped.' And that was the end of the conversation." (*Id.* at 78:15–16).

In October 2018, CNY Fair Housing submitted a request for designated parking as a reasonable accommodation on behalf of the Individual Plaintiffs, including Bartoszewski. (Dkt. No. 159-33, at 2–3). Trice allegedly wrote to multiple residents, stating that they could be provided with a designated parking space for a $350 fee, but Bartoszewski only heard about

10

Trice's written correspondence from other residents; she did not receive it. (Dkt. No. 159-4, at 81:2–8).

Before Bartoszewski moved to Camillus Pointe, she had also "asked . . . to be near the elevator and near the front door because [she] couldn't walk very far." (*Id.* at 23:17–19). After she moved in, she was informed by Trice for the first time that rent for her unit would be $15 higher than for similar units because it was in a "prime location on the first floor." (*Id.* at 75:15–25). In July 2019, Casey Fitzgerald sent a letter to Trice on behalf of Bartoszewski and another Camillus Pointe resident requesting that the additional $15 be waived because it was imposed for features that were necessary accommodations for their disabilities. (Dkt. No. 181-4, at 2–3). It is not clear from the record whether Trice responded to Fitzgerald's letter.

### 2. Deanna Town

Plaintiff Deanna Town has lived in a first-floor apartment at Camillus Pointe since 2016. (Dkt. No. 159-2, ¶ 16; Dkt. No. 173-1, ¶ 16; Dkt. No. 159-8, at 6:4–6, 31:13–15). She has degenerative back problems and neuropathy in her legs, which limit her mobility and balance. (Dkt. No. 159-8, at 56:14–58:16, 60:8–25, 132:10–133:6). When she moved to Camillus Pointe, she used a cane as a mobility aid. (*Id.*). Since having back surgery in 2017, she has used a walker. (*Id.*).

Town has had a DMV-issued disability parking placard since the 1990s, (*id.* at 60:8–25), and due to her mobility impairments requires a parking space close to her apartment. (Dkt. No. 159-2, ¶ 20; Dkt. No. 173-1, ¶ 20; Dkt. No. 159-8, at 61:25–62:8, 64:21–68:13, 131:12–132:9). When Town moved to Camillus Pointe, she was informed by Clover Management Operations Manager Debbie Kucia that "there [were] no assigned parking spaces." (Dkt. No. 159-8, at 93:3–6, 129:25–130:11). Town was included in the 2018 request for designated parking submitted by CNY Fair Housing. (Dkt. No. 159-33, 2–3).

When she moved in, Town was told by a Clover employee that rent for first-floor units and units close to the elevator would be $25 a month more than other units. (Dkt. No. 159-8, at 38:4–14). Because she needed a first-floor unit due to her disabilities, she has paid this extra $25 a month ever since. (*Id.*). Town has never made a reasonable accommodation request for a rent reduction. (Dkt. No. 173-1, ¶ 211; Dkt. No. 181-36, at ¶ 211).

### 3.      Lois Harter

Plaintiff Lois Harter lived in a third-floor apartment at Camillus Pointe from December 2016 until her death in September 2022. (Dkt. No. 159-2, ¶ 8; Dkt. No. 173-1, ¶ 8). From the time she moved to Camillus Pointe, Harter had disabilities that affected her mobility and balance—fibromyalgia and arthritis, as well as neuropathy in her feet. (Dkt. No. 159-2, ¶ 10; Dkt. No. 173-1, ¶ 10). She could not walk without the assistance of a cane or walker and had difficulty walking long distances. (Dkt. No. 159-2, ¶ 11; Dkt. No. 173-1, ¶ 11). Harter never made a reasonable accommodation request for a reduction in her rent and never requested a transfer to a first-floor unit. (Dkt. No. 173-1, ¶ 205; Dkt. No. 181-36, ¶ 205).

### D.      Testing

### 1.      Designated Parking

In October 2018, Plaintiff CNY Fair Housing received complaints from residents at Camillus Pointe regarding disability discrimination by Clover Group. (Dkt. No. 159-2, ¶ 31; Dkt. No. 173-1, ¶ 31; Dkt. No. 159-7; Dkt. No. 159-12, at 28:13–29:4). CNY Fair Housing opened a fair housing investigation of rental policies and practices at Clover properties located in its service area and had testers contact Clover properties in New York, including New Hartford Square, Morgan Square Apartments, Buckley Square Apartments, and Reynolds Pointe Senior Apartments. (Dkt. No. 159-2, ¶ 32; Dkt. No. 173-1, ¶ 32; Dkt. No. 159-10, at 43:6–17; Dkt. No. 159-12, at 26:24–27:9).

The other Organizational Plaintiffs opened similar investigations of Clover senior properties located in their service areas. HOME of Buffalo sent testers to additional Clover properties in New York, including Orchard Place Senior Apartments, Sweet Home Senior Apartments, and South Pointe Senior Apartments. (Dkt. No. 159-2, ¶ 52; Dkt. No. 173-1, ¶ 52; Dkt. No. 159-21, at 66:23–67:11).

The Fair Housing Partnership had testers contact Clover senior properties located in western Pennsylvania, including Bethel Square Senior Apartments, Harbor Creek Senior Apartments, Lafayette Square Senior Apartments, Green Ridge Senior Apartments, and Oak Hill Senior Apartments. (Dkt. No. 159-2, ¶¶ 92–99; Dkt. No. 173-1, ¶¶ 92–99). "Clover representatives" informed each tester that there was an extra fee for a first-floor or near-elevator unit. (*Id.*).

The Fair Housing Center and HOME of Cincinnati had testers contact Clover senior properties located in Ohio, including Lorain Pointe Senior Apartments, Southpark Square Senior Apartments, Parma Village Senior Apartments, Ivy Point Senior Apartments, Eden Park Senior Apartments, and Fairfield Village Senior Apartments. (Dkt. No. 159-2, ¶ 56; Dkt. No. 173-1, ¶ 56; Dkt. No. 159-23, at 48:2–7).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The moving party bears the initial

burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at

323. If the moving party meets this burden, the nonmoving party must "set forth specific facts

showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*,

477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"When ruling on a summary judgment motion, the district court must construe the facts

in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d

775, 780 (2d Cir. 2003). "Where . . . there are cross-motions for summary judgment, 'each

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration.'" *Lumbermens*, 628 F.3d

at 51 (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## IV.    DISCUSSION

Plaintiffs move for summary judgment "on three issues: (1) that Defendants' policies and

practices related to the receipt and processing of reasonable accommodation requests for

designated parking violate the [FHA] and New York and Ohio state fair housing laws; (2) that

Defendants' denial or constructive denial of the Individual Plaintiffs' parking-related reasonable

accommodations requests violated the [FHA] and New York and Ohio state fair housing laws;

and (3) that Defendants' policy of refusing all premium rent-related reasonable accommodation

requests violates the [FHA] and New York and Ohio state fair housing laws."[4] (Dkt. No. 159, at

5). Defendants cross-move for summary judgment "dismissing counts I–III of the complaint: (1)

---

[4] Plaintiffs also allege disability discrimination on the basis of disparate treatment and disparate impact, (Dkt. No. 1
¶¶ 133–39), but only move for summary judgment on their reasonable accommodation claims, (Dkt. No. 159-1, at
12).

with respect to rental pricing, under any theory, as a matter of law; (2) with respect to any property that is not owned or managed by an[y] defendant, or any property that is not identified in the complaint; and (3) with respect to New Hartford [Square] Senior Apartments and Reynolds Pointe Senior Apartments as to parking-related claims for failure to establish a prima facie case; [and] [d]enying Plaintiffs' motion for summary judgment in its entirety, with prejudice, and disregarding Plaintiffs proffered Exhibits 6, 12, 24, 42, 55 and portions of Exhibit 3 as inadmissible." (Dkt. No. 173, at 2).

### A.   Plaintiffs' Motion for Summary Judgment

#### 1.   Individual Plaintiffs' Parking-Related Requests

The Court first addresses Plaintiffs' motion for summary judgment on the claim "that Defendants' denial or constructive denial of the Individual Plaintiffs' parking-related reasonable accommodations requests violated the [FHA] and New York and Ohio state fair housing laws." (Dkt. No. 159-1, at 5). Plaintiffs argue that the Individual Plaintiffs sought designated parking as a reasonable accommodation and "met all the requirements under the fair housing laws for having the requests granted" and that Defendants "cannot show that they would have faced any undue hardship or burden from granting the requests." (*Id.* at 8). Defendants offer multiple arguments regarding the adequacy of their policies and practices for processing requests for reasonable accommodations but do not clearly address the specific requests made by the Individual Plaintiffs. (Dkt. No. 173-24, at 65–66).

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any . . . renter because of a handicap." 42 U.S.C. § 3604(f)(1); *see also City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 (1995) ("[The FHA] prohibits discrimination in housing against, *inter alios*, persons with handicaps."). Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when

such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

"A plaintiff may establish discrimination under the FHA under one of three theories: disparate treatment, disparate impact, or failure to make reasonable accommodations." *Hevner v. Vill. East Towers, Inc.*, No. 06-cv-3983, 2011 WL 666340, at *2, 2011 U.S. Dist. LEXIS 12579, at *5 (S.D.N.Y. Feb. 7, 2011) (citing *Reid v. Zackenbaum*, No. 05-cv-1569, 2005 WL 1993394, at *3, 2005 U.S. Dist. LEXIS 17177, at *7 (E.D.N.Y. Aug. 17, 2005)), *aff'd* 471 F. App'x 73 (2d Cir. 2012) (summary order). To prevail on a reasonable accommodation claim, a plaintiff must establish: "(1) that she is handicapped within the meaning of § 3602(h) and [the] defendant knew or should have known of this fact; (2) that an accommodation is necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (3) that such accommodation is reasonable; and (4) that the defendant refused to make the requested accommodation." *Id.* (citing *Echeverria v. Krystie Manor, LP*, No. 07-cv-1369, 2009 WL 857629, at *6, 2009 U.S. Dist. LEXIS 27353, at *19 (E.D.N.Y. Mar. 30, 2009)). Reasonable accommodation claims under the NYSHRL and the Ohio Civil Rights Act are evaluated under the same framework as claims brought under the FHA. *See Wilshire v. L&M Dev. Partners*, No. 20-cv-7998, 2022 WL 847067, at *4 n.3, 2022 U.S. Dist. LEXIS 51198, at *12 n.3 (S.D.N.Y. Mar. 22, 2022) ("[C]laims under the NYSHRL are evaluated under the same framework as claims under the FHA.") (citing *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014)); *Phillips v. Acacia on the Green Condo. Ass'n, Inc.*, No. 20-4182, 2022 WL 1692948, at *3, 2022 U.S. App. LEXIS 14688, at *7 (6th Cir. May 26, 2022) ("This provision is analogous to the FHAA's anti-discrimination housing provisions.") (citing Ohio Rev. Code § 4112.02(H)(4);

16

*Ohio Civ. Rts. Comm'n v. Harlett*, 724 N.E.2d 1242, 1244 (Ohio Ct. App. 1999); *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1041, 1043 (6th Cir. 2001)).

Because the Court finds that no genuine dispute of material fact exists as to the elements of the Individual Plaintiffs' parking-related reasonable accommodation claims, Plaintiffs' motion for summary judgment is granted as to those claims.

First, there is no genuine dispute that the Individual Plaintiffs were handicapped within the meaning of the FHA and that Defendants knew or should have known this. The FHA defines "handicap" as "a physical or mental impairment which substantially limits one or more of [a] person's major life activities," 42 U.S.C. § 3602(h), and walking is a "major life activit[y]" under United States Department of Housing and Urban Development ("HUD") regulations, 24 C.F.R. § 100.201(b). At all times relevant to this case, the Individual Plaintiffs had disabilities that impaired their mobility. Bartoszewski had rheumatoid arthritis, stenosis of the spine, and pleurisy. (Dkt. No. 159-2, ¶ 2; Dkt. No. 173-1, ¶ 2). She had difficulty breathing when walking long distances and could not stand for longer than ten minutes. (Dkt. No. 159-2, ¶ 3; Dkt. No. 173-1, ¶ 3). Camillus Pointe property managers were aware that Bartoszewski's mobility was impaired because they saw her using a mobility aid. (Dkt. No. 181-1, ¶ 155; Dkt. No. 183-4, ¶ 155). Town had undergone multiple back surgeries and suffered from neuropathy. (Dkt. No. 159-2, ¶ 17; Dkt. No. 173-1, ¶ 17). Her mobility impairments were "obvious," (Dkt. No. 159-2, ¶ 22; Dkt. No. 173-1, ¶ 22); she relied on a wheeled walker and had a disability parking placard, (Dkt. No. 159-2, ¶¶ 17–18; Dkt. No. 173-1, ¶¶ 17–18). Harper had fibromyalgia and arthritis, as well as neuropathy in her feet. (Dkt. No. 159-2, ¶ 10; Dkt. No. 173-1, ¶ 10). She could not walk without a cane or walker and struggled to walk long distances. (Dkt. No. 159-2, ¶ 11; Dkt. No. 173-1, ¶ 11).

Second, the record establishes that designated parking was necessary to afford the Individual Plaintiffs an equal opportunity to use and enjoy their Camillus Pointe apartments and reasonable under the circumstances. "Whether a requested accommodation is required . . . is 'highly fact-specific, requiring case-by-case determination.'" *Bentley v. Peace & Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 344 (E.D.N.Y. 2005) (quoting *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994) ("*Cal. Mobile Home Park I*")). "Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap." *Id.* (internal quotation marks omitted) (quoting *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998)). "A requested accommodation is reasonable where the cost is modest and it does not pose an undue hardship or substantial burden on the rule maker." *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016) (citing *Olsen*, 759 F.3d at 156). "It is clear under the [FHA] that a landlord may be 'required to incur reasonable costs to accommodate [a person's handicap] provided such accommodations do not pose an undue hardship or a substantial burden.'" *Hubbard v. Samson Mgmt. Corp.*, 994 F. Supp. 187, 190 (S.D.N.Y. 1998) (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 335 (2d Cir. 1995)). That said, a landlord is not "obligat[ed] to do everything humanly possible to accommodate a disabled person; cost (to the defendant) and benefit (to the plaintiff) merit consideration as well." *Id.* (quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)).

HUD regulations implementing the "reasonable accommodation" requirements of 42 U.S.C. § 3604 provide two examples of a necessary and reasonable accommodation, one of which is particularly relevant here:

> Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a first come first served basis. John applies for housing in Progress Gardens. John is mobility impaired and is unable to walk

> more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of § 100.204 for the owner or manager of Progress Gardens to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have great difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

24 C.F.R. § 100.204(b).

In this case, it is undisputed that, "from at least 2018 to mid-2023," parking at all Clover senior communities was provided on a first-come, first-serve basis. (Dkt. No. 159-2, ¶ 89; Dkt. No. 173-1, ¶ 89). Camillus Pointe residents were not guaranteed parking spaces close to their apartments. Residents who did not have mobility impairments would have been able to walk between their apartments and cars without issue, even if the only available parking was located some distance from their apartments. But the Individual Plaintiffs had mobility impairments, making those same walks more difficult. (*See, e.g.*, Dkt. No. 181-1, ¶ 154; Dkt. No. 183-4, ¶ 154 (Bartoszewski experienced extreme pain walking); Dkt. No. 181-1, ¶ 165; Dkt. No. 183-4, ¶ 165 (Town had to stop multiple times when walking from her unit to the main entrance of the building); Dkt. No. 159-2, ¶ 11; Dkt. No. 173-1, ¶ 11 (Harter could not walk without a cane or walker and struggled to walk long distances). In other words, because of their handicaps, the Individual Plaintiffs experienced more difficulty than non-handicapped residents walking to and from their cars and therefore did not enjoy the same access to their apartments as those residents. Designated parking would have equalized their access and was therefore necessary to accommodate their disabilities. *See Hubbard*, 994 F. Supp. at 191.

Courts in this Circuit have found designated parking to be a reasonable accommodation for residents with mobility impairments and that landlords can be responsible for associated costs. *See, e.g.*, *Shapiro*, 51 F.3d at 335 (finding that a cooperative apartment complex could be required to incur reasonable costs associated with providing designated parking for a disabled resident); *Hubbard*, 994 F. Supp. at 191 (finding that a landlord should have accommodated a tenant's disability by providing her a designated parking space close to her apartment). Defendants concede that designated parking may be a reasonable accommodation under the FHA. (Dkt. No. 173-124, at 65). And nothing in the record indicates that providing designated parking for the Individual Plaintiffs or covering associated costs would have presented an undue hardship or substantial burden for Defendants in this case. To the contrary, Defendants appear to have had a policy and procedure for handling requests for designated parking, (*see, e.g.*, Dkt. No. 159-34, at 2 (email from then-Vice President of Operations Emily Brady describing Defendants' policy)), and in fact provided designated parking for other Camillus Pointe residents, (*see* Dkt. No. 159-11, at 166:12–168:8). Thus, designated parking was not just necessary but reasonable under the circumstances.

Finally, the Court finds that Defendants refused to make the Individual Plaintiffs' requested accommodations. Plaintiffs assert in their Statement of Material Facts that Bartoszewski met with Property Manager Tanya Trice shortly after moving to Camillus Pointe to request a designated parking space and that Trice rejected Bartoszewski's request, commenting that "'everybody' at the property was 'handicapped,'" (Dkt. No. 159-2, ¶ 6); Town asked then-Property Manager Debby Kusiya about designated parking before and after moving to Camillus Pointe and was informed that there was no designated parking at the property, (*id.* ¶¶ 21, 24); and Harter complained to Camillus Pointe management about the lack of accessible parking and

20

designated parking on multiple occasions and management told Harter that "Camillus Pointe already had a legally adequate amount of handicap parking and did not engage with Harter further on the matter," (*id.* ¶¶ 12, 14).

Defendants purport to deny these asserted facts in their response to Plaintiffs' Statement of Material Facts but do not cite record evidence that would raise a genuine dispute as to the truth of those facts. (Dkt. No. 173-1, ¶¶ 6, 12, 14, 21, 24). Local Rule 56.1(b) requires that Defendants' response "mirror [Plaintiffs'] Statement of Material Facts by admitting and/or denying each of [Plaintiffs'] assertions in a short and concise statement, in matching numbered paragraphs" and specifies that any denial must "set forth a specific citation to the record where the factual issue arises." Under Local Rule 56.1(b), "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Where, as here, Plaintiffs have properly supported their asserted facts with pinpoint citations to record evidence and Defendants have failed to cite to any record evidence, the Court will deem those facts admitted. *See Carlisle v. UPS, Inc.*, No. 15-cv-1376, 2017 WL 3738697, at *2, 2017 U.S. Dist. LEXIS 138909, at *5–7 (N.D.N.Y. Aug. 29, 2017); *Zhao-Royo v. N.Y. State Educ. Dep't*, No. 14-cv-935, 2017 WL 149981, at *2 n.2, *3 n.4, 2017 U.S. Dist. LEXIS 5080, at *3 n.2, *4 n.4 (N.D.N.Y. Jan. 13, 2017). Therefore, the Court deems the above facts admitted and finds that Defendants rejected the Individual Plaintiffs' requests for designated parking spaces.

Additionally, Casey Fitzgerald emailed Tanya Trice on October 31, 2018, requesting designated parking as a reasonable accommodation on behalf of ten Camillus Pointe residents, including the Individual Plaintiffs. (Dkt. No. 159-33, at 2–3). Emily Brady responded to Fitzgerald on November 5, 2018, stating that "Camillus Pointe . . . , like all of our other

communities, does not have assigned resident parking" but that "we are willing to review any request for a reasonable accommodation." (Dkt. No. 159-34, at 2). However, Brady later admitted at her February 23, 2023 deposition that she had a "problem" with Fitzgerald approaching Camillus Pointe residents and that she did not grant the requests for designated parking spaces because the proper process was not followed. (Dkt. No. 159-2, ¶ 92; Dkt. No. 173-1, ¶ 92).

In sum, Defendants were required under the FHA to provide designated parking for Individual Plaintiffs and, by failing to do so, violated the FHA. Plaintiffs' motion for summary judgment is granted as to the Individual Plaintiffs' FHA and NYSHRL reasonable accommodation claims.

### 2. Defendants' Policies and Practices

Plaintiffs also seek a broader finding that Defendants' policies and practices concerning the receipt and processing of designated parking- and rent-related reasonable accommodation requests violate the FHA and its New York and Ohio state law analogs. (Dkt. No. 159, at 1). On this, the Court finds that granting summary judgment would be inappropriate.

As an initial matter, relevant discovery matters are incomplete. *See Celotex Corp.*, 477 U.S. at 322 (explaining that the purpose of summary judgment is to allow for the disposition of a case "after adequate time for discovery" has elapsed); *see also Toussie v. Allstate Ins. Co.*, 213 F. Supp. 3d 444, 445 (E.D.N.Y. 2016) (noting that "courts routinely deny motions for summary judgment as premature when discovery over relevant matters is incomplete"). Plaintiffs moved for summary judgment on November 20, 2023, (Dkt. No. 159), to meet the deadline for filing dispositive motions set by United States Magistrate Judge Miroslav Lovric, who also ordered that fact discovery be completed by October 9, 2023, motions to compel discovery be filed by October 16, 2023, and expert depositions be completed by October 27, 2023, (Dkt. No. 130). On

November 27, 2023, however, Plaintiffs appealed an order by Magistrate Judge Lovric denying two motions to compel Defendants to produce information about Contested Properties.[5] (Dkt. No. 162). The Court granted Plaintiffs' appeal and remanded the motions to Magistrate Judge Lovric for further consideration. (Dkt. No. 187).

Because the Court granted Plaintiffs' appeal, discovery in this case is ongoing. Plaintiffs suggest that the Court can decide their motion for summary judgment before discovery is completed. (Dkt. No. 159-1, at 5 n.1). But to grant a motion for summary judgment, the Court must determine that no genuine dispute of material fact exists. Fed. R. Civ. P. 56(a). The record supports such a determination with respect to the Individual Plaintiffs' parking-related failure to accommodate claims, as the Court has explained. But additional facts relevant to Defendants' policies and practices are outstanding, and without all relevant facts the Court cannot determine that no dispute of fact exists as to these policies and practices. To the contrary, Plaintiffs' appeal reveals a dispute over the reach of these policies and practices, as well as to who ultimately is responsible for them. This alone is a sufficient basis for the Court to deny summary judgment.

There are also disputes over the substance of Defendants' policies and practices that would preclude summary judgment even if discovery was completed. For example, Plaintiffs assert that Defendants have a practice of outright denying requests for designated parking. The record is replete with evidence that Clover employees respond negatively to questions about designated parking. (*See, e.g.*, Dkt. No. 159-45, at 9–10 (A representative of Harborcreek Senior Apartments wrote to one tester on May 8, 2019, that "we do not have assigned parking for residents at this time."); Dkt. No. 159-51, at 17–18 (A representative of Southpark Square Senior

---

[5] Plaintiffs advised the Court of their intent to appeal Magistrate Judge Lovric's order, noting the ongoing discovery dispute in their motion for summary judgment. (Dkt. No. 159-1, at 5 n.1).

Apartments informed a different tester on November 20, 2023, that his father would not be able to reserve a handicapped parking space "[b]ecause . . . almost half of our residents have handicapped spots.")). But the record also includes a January 22, 2024 declaration in which Emily Brady states that requests for designated parking are handled on a case-by-case basis and commonly approved. (Dkt. No. 173-77, ¶¶ 71, 87). And from letters to residents at New Hartford Square Senior Apartments and Sweet Home Senior Apartments it appears that certain requests for designated parking are in fact approved. (Dkt. No. 173-103, at 7–11, 16–17). Similarly, Plaintiffs offer strong factual support for their contention that Defendants refuse all premium rent-related reasonable accommodation requests. (*See, e.g.*, Dkt. No. 159-32, at 145:1–11 (Emily Brady responded in the negative when asked at her February 23, 2023 deposition whether "a request [] for a ground floor unit reasonable accommodation from the extra rent for a person with a . . . mobility impairment" would "be a reasonable accommodation that you would grant under Clover's current policy."); Dkt. No. 159-65, at 128:10–14 (Michael Joseph, President of Clover Management, testified at his July 31, 2023 deposition that "[i]t is my belief that we are not required to grant price reductions in rents as a reasonable accommodation. Therefore, I would not be in favor of reducing rent as a reasonable accommodation for somebody when we don't accept rents that way."). However, this contention is to some extent undermined by Kenneth Knox, Clover Management Vice President of Operations, who testified at his August 15, 2023 deposition that "[e]very property is different. . . . Essentially, each reasonable accommodation request [] is handled on a case-by-case basis. There is not a blanket way to just stamp them all out." (Dkt. No. 173-113, at 154:9–19).[6]

---

[6] In any event, any assessment of the reasonableness of Defendants' alleged policy of refusing all premium rent-related reasonable accommodation requests is at this time premature. *See Cal. Mobile Home Park I*, 29 F.3d at 1418 ("We are not presently deciding that the fees in this case were improperly assessed. We hold only that such charges must be examined on a case-by-case basis to determine whether, in a given case, a waiver of the charge, in whole or at least in

There is also strong evidence that, to the extent Defendants granted requests for designated parking, they assessed a fee. Brady testified at her September 26, 2023 deposition that "properties did charge for signage related to designated parking requests." (Dkt. No. 159-11, at 158:19–21). However, Brady has also declared that "[a]lthough it was a general practice to pass through the parking lot modification costs incurred for reserving parking until in or about April 2021, such practice did not occur at every property, signage costs were not consistently assessed to or paid by residents seeking reserved parking, [] tenants were provided with their requested parking accommodations regardless of whether or not they paid the parking lot modification costs," and "[a]s of September 2022, any then-current residents with reserved parking were reimbursed any cost they paid with respect to signage and installation." (Dkt. No. 173-77, ¶¶ 83, 86). And to the extent Plaintiffs assert that Defendants impermissibly required reasonable accommodation requests to be submitted in writing, there is record evidence that district managers were instructed to assist residents unable to put their requests into writing and that requests were approved whether in writing or not. (Dkt. No. 159-32, at 102:22–103:8; 104:22–105:6).

These disputes over the substance of Defendants' policies and practices distinguish this case from those cited by Plaintiffs in which courts in this Circuit have observed that a policy of categorically refusing to even consider a particular accommodation would preclude an individualized assessment of a handicapped individual's needs and therefore violate the FHA (or,

---

part, 'may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling,' 42 U.S.C. § 3604(f)(3)(B), and whether such waiver would impose an undue burden on the landlord."); *see also Noll v. Int'l Business Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) ("The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder.").

as relevant, the Americans with Disabilities Act or the Rehabilitation Act[7]). *See, e.g.*, *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76–77 (2d Cir. 2016). In *Wright*, a mobility-impaired inmate sued the New York State Department of Corrections and Community Supervision and several of its officers (collectively, "DOCCS") seeking declaratory and injunctive relief allowing him to use his motorized wheelchair at DOCCS facilities. *Id.* at 68. In that case, the Second Circuit vacated the district court's grant of summary judgment in favor of DOCCS, holding, *inter alia*, that "DOCCS's blanket ban on motorized wheelchairs violates the [Americans with Disabilities Act] and the [Rehabilitation Act]." *Id.* at 76–77.

Similarly, in *Fair Housing Justice Center, Inc. v. Allure Rehabilitation Services LLC*, the court considered allegations that the owners of various nursing homes and assisted living residences refused to consider providing American Sign Language interpreters and noted that such "an unqualified refusal . . . would constitute the denial of full access to the facilities and would violate the [Rehabilitation Act]." No. 15-cv-6336, 2017 WL 4297237, at *4, 2017 U.S. Dist. LEXIS 157882, at *12–13 (E.D.N.Y. Sept. 26, 2017). And in *Fair Housing Justice Center, Inc. v. Cuomo*, which involved allegations that certain adult care facilities prohibited wheelchairs, another court found that the plaintiff's failure to specifically ask for an accommodation did not render their allegations insufficient because "any request for a reasonable accommodation would have been futile." No. 18-cv-3196, 2019 WL 4805550, *14, 2019 U.S. Dist. LEXIS 170119, *36–38 (S.D.N.Y. Sep. 30, 2019).

Plaintiffs argue that the Court may grant summary judgment in their favor because Defendants' policies and practices resemble those at issue in *Wright*, *Allure*, and *Cuomo*. (*See*

---

[7] Courts in the Second Circuit have recognized that the reasonable accommodation provisions of the ADA, Section 504 of the Rehabilitation Act, and the FHA are to be interpreted similarly. *See, e.g.*, *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 337 (E.D.N.Y. 2012) (collecting cases).

Dkt. No. 159-1, at 5–9). But in *Wright*, DOCCS conceded that the department categorically banned motorized wheelchairs. 831 F.3d at 76. And in *Allure* and *Cuomo*, decided at the motion to dismiss stage, the courts accepted as true allegations that the defendants categorically refused to provide certain accommodations. 2017 WL 4297237, at *4, 2017 U.S. Dist. LEXIS 157882, at *12–13; 2019 WL 4805550, *14, 2019 U.S. Dist. LEXIS 170119, *36–38. Here, by contrast, there is conflicting evidence as to what Defendants' policies and practices entail. This would preclude summary judgment even if discovery was not ongoing. Accordingly, Plaintiffs' motion for summary judgment is denied as to Defendants' parking- and rent-related policies and practices.

## B.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment "dismissing counts I–III of the complaint: (1) with respect to rental pricing, under any theory, as a matter of law, (2) with respect to any property that is not owned or managed by any defendant, or any property that is not identified in the complaint, and (3) with respect to New Hartford Square Senior Apartments and Reynolds Pointe Senior Apartments as to parking related claims for failure to establish a prima facie case; [and] denying Plaintiffs' motion for summary judgment in its entirety, with prejudice, and disregarding Plaintiffs proffered Exhibits 6, 12, 24, 42, 55 and portions of Exhibit 3 as inadmissible." (Dkt. No. 173, at 2).

### 1.    Rental Pricing

#### a.    Reasonable Accommodation

As the Court has explained, to prevail on a reasonable accommodation claim, a plaintiff must establish: "(1) that she is handicapped within the meaning of § 3602(h) and [the] defendant knew or should have known of this fact; (2) that an accommodation is necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (3) that such

accommodation is reasonable; and (4) that the defendant refused to make the requested accommodation." *Hevner*, 2011 WL 666340, at *2, 2011 U.S. Dist. LEXIS 12579, at *5 (citing *Echeverria*, 2009 WL 857629, at *6, 2009 U.S. Dist. LEXIS 27353, at *19). Courts in this Circuit have also noted that a policy of categorically refusing to even consider a particular accommodation would preclude an individualized assessment of a handicapped individual's needs and therefore violate the FHA. *See, e.g.*, *Wright*, 831 F.3d at 76–77.

Providing a mobility-impaired resident with an apartment located on the first floor or close to an elevator may be necessary to "equalize their opportunity to use and enjoy [their] dwelling." *Hubbard*, 994 F. Supp. at 191; *see also Welltower Inc.*, 588 F. Supp. 3d at 298. And, in this case, it appears that Defendants have "routinely granted disability-related requests" to transfer to premium units—and have waived the generally applicable transfer fee. (Dkt. No. 173-1, ¶ 194; Dkt. No. 181-36, ¶ 194). Therefore, the only question with respect to Defendants' rental pricing policy is whether a mobility-impaired resident who requests a premium unit as a reasonable accommodation is also entitled to a waiver of the generally applicable differential in rental rates between premium and non-premium units. Answering this question requires analyzing whether such a waiver would "unduly burden the landlord or inappropriately advantage [the resident] relative to other [residents]." *Hubbard*, 994 F. Supp. at 191; *see id.* at 190 ("[A]n accommodation should not 'extend a preference to handicapped residents [relative to other residents], as opposed to affording them equal opportunity.'" (quoting *Cal. Mobile Home Park I*, 29 F.3d at 1418)).

In *Hubbard*, Judge Parker ruled that a mobility-impaired plaintiff should not have to pay for a reserved parking space near her apartment even though the landlord generally charged a monthly fee for reserved parking because providing the plaintiff with a parking space for free

would not have decreased the landlord's income—since the parking space near her apartment was not one for which the landlord collected a fee—and giving the plaintiff that space would not have reduced the number of reserved spaces other tenants paid for. 994 F. Supp. at 191–92. Judge Parker rejected the defendant's argument that the plaintiff should have to pay for the parking space because she could afford to:

> Whether Hubbard could afford to pay the fee is irrelevant because the contemplated accommodation does not require the waiver of a generally applicable fee. A tenant's ability to pay should only be considered when the contemplated accommodation involves a waiver of a generally applicable fee. . . . Because Sleepy Hollow tenants are not required to pay a monthly fee in order to park in reasonable proximity to their apartments, Hubbard's ability to pay is immaterial.

*Id.* at 192 (citations omitted). However, Judge Parker noted that if the defendant "had required that all tenants pay a monthly fee in order to park . . . then a balancing test that considered [the plaintiff's] ability to pay would have been appropriate." *Id.* at 192 n.8. Judge Parker cited to the balancing test factors discussed by the Ninth Circuit in *California Mobile Home Park I*, which include "the amount of fees imposed, the relationship between the amount of fees and the overall housing cost, the proportion of other tenants paying such fees, the importance of the fees to the landlord's overall revenues, and the importance of the fee waiver to the handicapped tenant." *Id.* (quoting 29 F.3d at 1418).[8]

The Ninth Circuit found in *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1381 (9th Cir. 1997) ("*Cal. Mobile Home Park II*"), that these factors are "relevant to the balancing of interests inherent in any 'reasonableness' determination." In that case, the Ninth

---

[8] The Ninth Circuit explained that "[s]ome generally applicable fees might be too small to have any exclusionary effect. Other fees might be sustained because to require their waiver would extend a preference to handicapped residents, as opposed to affording them equal opportunity. The waiver of others might impose an undue financial burden on the landlord. The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination." *Cal. Mobile Home Park I*, 29 F.3d at 1418 (footnote omitted).

Circuit agreed with the trial court's verdict for the defendant because the plaintiff failed to show that the fee charged caused the denial of her use and enjoyment of her home. *Id.* at 1380; *see* 42 U.S.C. 3604(f)(3)(B) (prohibiting refusal to "make reasonable accommodations in rules . . . when such accommodations may be necessary to afford . . . equal opportunity to use and enjoy a dwelling").

In this case, Defendants object to Plaintiffs' characterization of the differential in rental rates between premium and non-premium units—of roughly $30, (Dkt. No. 159-2, ¶ 122; Dkt. No. 173-1, ¶ 122)—as a "fee." (*See* Dkt. No. 173-124, at 22). But the differential is generally applicable to all residents, whether or not it is labeled a fee. And, if Defendants are required under the FHA to reduce rent by the amount of the differential in the case of a mobility-impaired resident who requests a premium unit as a reasonable accommodation, Defendants should not be permitted to shirk this requirement simply by drawing a semantic distinction. Judge Parker's discussion of the Ninth Circuit balancing test for analyzing generally applicable fees provides a helpful way of framing the parties' dispute regarding Defendants' pricing policy. Rent reduction can be a necessary and reasonable accommodation. *See Welltower Inc.*, 588 F. Supp. 3d at 298. But, in light of the balancing test for determining reasonableness, and the fact that the parties have not briefed the applicability of such a test here, the Court concludes that there are triable issues of fact that should be submitted to a jury. *See Noll*, 787 F.3d at 94 ("The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder."). Therefore, the Court declines to grant summary judgment on the issue of Defendants' rent-related policies and practices.

As to the Individual Plaintiffs' rent-related reasonable accommodation claims, Defendants contend that they must fail because Town and Harter did not "request[] a reduction

in rent because of their disabilities" and Bartoszewski did not "establish that she lacked the financial means to afford Premium Unit rent, much less that this lack of means was caused by her disability or that the rate caused her to be unable to use and enjoy her Premium Unit." (Dkt. No. 173-124, at 46–47).

The Court first notes that Harter's estate "is not pursuing a claim based on a denial of a reasonable accommodation request related to a ground-floor or near-elevator unit," meaning there is no claim for the Court to consider. (Dkt. No. 181, at 54 n.25).

With respect to Bartoszewski's claim, Plaintiffs respond that "[she] made an explicit, specific request for a waiver of the premium rent" which "triggered Defendants' duty to assess the accommodation request because it" contained sufficient information to place Defendants on notice. (Dkt. No. 181, at 54 (citing *Elliott v. QF Circa 37, LLC*, No. 16-cv-288, 2018 WL 2933467, at *7, 2018 U.S. Dist. LEXIS 98668, at *20–21 (S.D. Cal. June 12, 2018))). The Court agrees. On July 1, 2019, Casey Fitzgerald sent a letter on behalf of two residents, including Bartoszewski, to Tanya Trice requesting rent reduction as a reasonable accommodation. (Dkt. No. 181-4, at 2–3). A reasonable factfinder could find that this letter put Defendants on notice that a reasonable accommodation was being requested. *See* U.S. Dep't of Hous. & Urban Dev., U.S. Dep't of Justice, Joint Statement on Reasonable Accommodations Under the Fair Housing Act, at 10 (May 17, 2004) ("A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf."). Defendants' assertion that Bartoszewski "failed to establish that she lacked the financial means to afford Premium Unit rent" may be relevant to the factfinder's reasonableness determination using the balancing test discussed above but is an insufficient basis for granting summary judgment. *See Hubbard*, 994 F. Supp. at 192 ("A tenant's ability to pay

should only be considered when the contemplated accommodation involves a waiver of a generally applicable fee." (citing *Cal. Mobile Home Park I*, 29 F.3d at 1418; *Samuelson v. Mid–Atlantic Realty Co.*, 947 F. Supp. 756, 761 (D. Del. 1996))). Defendants' motion is therefore denied as to Bartoszewski's rent-related reasonable accommodation claim.

Turning to Town's claim, Plaintiffs contend that she was not required to make a request because the futile gesture theory, under which a member of a protected class's failure to request a particular accommodation does not prejudice her claims, applies in her case. (Dkt. No. 181, at 53–54). On this, the Court disagrees. "[T]he Second Circuit has recognized the 'futile gesture' theory in other contexts beyond employment discrimination." *273 Lee Ave. Tenants Ass'n by Sanchez v. Steinmetz*, 330 F. Supp. 3d 778, 794 (E.D.N.Y. 2018) (citing *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993); *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 189 (2d Cir. 2013)). But "as the Second Circuit explained in *Brown v. Coach Stores*, 'the leniency afforded individual plaintiffs [in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), where the futile gesture theory was first applied in the employment discrimination context,] . . . hinged on an initial finding of a history of discrimination by the employer to the class of plaintiffs.'" *Id.* (quoting 163 F.3d 706, 711 (2d Cir. 1998)). "In cases where there is no class-wide finding of discrimination, application of the futility rule is more problematic." *Id.*

Here, Defendants maintain that requests for rent-related reasonable accommodations are handled on a case-by-case basis and there has been no finding that Defendants had a policy or practice of categorically refusing to consider such requests. (Dkt. No. 183, at 18; *see also* Dkt. No. 173-113, at 154:9–19 (Kenneth Knox testified at his August 15, 2023 deposition that "each reasonable accommodation request [] is handled on a case-by-case basis. There is not a blanket

way to just stamp them all out.")). The record may support a finding that Town knew that Defendants charged more for first-floor and near-elevator units, but it does not support a finding that Town was reliably informed that Defendants would have categorically refused to deviate from this policy. Defendants' motion is therefore granted as to Town's rent-related reasonable accommodation claim.

        **b.**      **Disparate Treatment**

The Second Circuit has remarked that "[d]isparate treatment is the most easily understood type of discrimination. The [defendant] simply treats some people less favorably than others because of their race, color, religion or other protected characteristics." *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 311 (2d Cir. 2020) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993)). Disparate treatment claims are analyzed under the FHA using the familiar *McDonnell Douglas* burden-shifting framework. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) (citing *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802–03 (1973)). "A plaintiff can establish a prima facie case of disparate treatment 'by showing that animus against the protected group was a significant factor in the [defendant's conduct].'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)). "[O]nce a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Skorupska v. 525 W. 52 Prop. Owner LLC*, 625 F. Supp. 3d 90, 110–11 (S.D.N.Y. 2022) (quoting *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* (quoting *Mitchell*, 350 F.3d at 47). "The ultimate burden of proof remains on the plaintiff to show that 'the defendant[] intentionally discriminated against

[him] on a prohibited ground.'" *Olsen*, 759 F.3d at 152 (quoting *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 49).

"Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it bears more heavily on [a protected class] may provide an important starting point.'" *Mhany Mgmt., Inc.*, 819 F.3d at 606 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). "Unless a 'clear pattern, unexplainable on grounds other than [handicapped status], [has] emerge[d],' 'impact alone is not determinative, and the Court must look to other evidence.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 267). "This other evidence includes whether the historical background of the policy reveals a series of actions taken for invidious purposes, departures from normal procedure and contemporary statements or information." *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 177 (E.D.N.Y. 2019) (citing *Arlington Heights*, 429 U.S. at 267).

Here, Plaintiffs argue that "Defendants were aware of the outsized need among people with disabilities for ground-floor and near-elevator units and as a result priced those units higher because of the high proportion of people with mobility impairments in their senior properties." (Dkt. No. 181, at 57). However, Defendants' facially neutral pricing policy applies to all residents of Clover senior properties whether handicapped or not. And while there is evidence that some Clover employees *assume* that first-floor units are leased faster—and therefore priced higher—than other units because they are accessible, (*see, e.g.*, Dkt. No. 159-37, 42:8–13 (Lynnanne Baggott, who has been employed by Clover Management in several roles, testified that "I just think for seniors, [first-floor units] were easier to navigate and maneuver."); Dkt. No.

159-66, 78:10–19 (Katie Hudson, a Clover Management Property Manager, testified that first-floor units were "easier to access. Didn't have to deal with the elevator, so people were drawn to the first floor for accessibility reasons."); Dkt. No. 159-67, at 44:15–45:8 (Defendants' expert, C. Paul Wazzan, testified that "I guess common sense tells me a lot of people living in these facilities are elderly. It is probably easier for them to access ground floor units."), Plaintiffs offer no non-speculative evidence that more handicapped residents at Clover senior properties prefer accessible units than non-handicapped residents.

All residents at Clover senior properties are at least fifty-five years old, after all, and it may be that accessibility is important to each of them—including those who are not handicapped within the meaning of the FHA. "Disparate treatment analysis . . . involves differential treatment of similarly situated persons or groups." *Wiltshire v. Dhanraj*, 421 F. Supp. 2d 544, 553 (E.D.N.Y. 2005) (quoting *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir. 1988)). And without any way to compare different groups of residents, no reasonable factfinder could conclude that the impact of Defendants' pricing policy "bears more heavily" on handicapped residents than non-handicapped residents. *Mhany Mgmt., Inc.*, 819 F.3d at 606 (quoting *Arlington Heights*, 429 U.S. at 267).

Plaintiffs have also failed to raise a triable issue of material fact as to whether Defendants' pricing policy was motivated by discriminatory intent. Plaintiffs point to the July 31, 2023 deposition of Clover Management President Michael Joseph, during which he testified that he did not care what was driving the demand for premium units and that his position would not change even if he learned that the driver was "easier access for seniors with mobility impairment." (Dkt. No. 159-65, at 120:13–17). But it is not clear that Joseph was involved in the creation of Defendants' pricing policy. (*See, e.g.*, Dkt. No. 159-65, at 113:1–12 (Asked at his

deposition whether he "participate[d] in any way in the decision to charge more per unit that are near elevators," Joseph testified, "that's in the weeds. I would not be deciding what we charge for different rents for different units, no.")). And, in any case, stray remarks are insufficient. *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." (quoting *Tomassi v. Insignia Financial Grp., Inc.*, 478 F.3d 111 (2d Cir. 2007)). While Joseph's testimony is arguably relevant to Plaintiffs' reasonable accommodation claims, as it suggests an unwillingness to deviate from Defendants' pricing policy, it does not indicate that the policy was motivated by discriminatory intent.

To the contrary, the evidence seems to establish that Defendants' pricing policy was designed to maximize profits. Joseph testified at his deposition that "[r]ents are set by supply and demand that have nothing to do with physical, mental, whatever infirmities or restrictions, that's not how it's done." (Dkt. No. 159-65, at 128:14–17). Emily Brady testified at her deposition that the only factor relied on in deciding that first-floor units could obtain higher rental rates than other units was the fact that "[t]he units on the first floor were leasing quicker than the rest of the building." (Dkt. No. 159-11, 216:6–22). And Clover Management Chief Financial Officer Geoffrey Maze similarly stated in a declaration that the "Identified Properties were developed, and are operated, as for-profit investments" and that rental prices at all senior and non-senior properties managed by Clover Management "are set according to market rates in the relevant geographic area." (Dkt. No. 173-14, ¶¶ 39, 42, 44). "Proof of discriminatory motive is critical." *Brooklyn Ctr. for Psychotherapy, Inc.*, 955 F.3d at 311 (quoting *Hazen Paper Co.*, 507 U.S. at 609). And Plaintiffs have failed to make raise a material issue of fact on this essential element.

Accordingly, Plaintiffs have failed to establish a prima facie case of disparate treatment, and, as a result, their other argument, "that Defendants' non-discriminatory explanations for its pricing scheme are inconsistent and implausible," also fails. (Dkt. No. 181, at 57). Under the *McDonnell Douglas* framework, "the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision" only "once [the] plaintiff has established a prima facie case of discrimination." *Skorupska*, 625 F. Supp. 3d 90, 110–11 (quoting *Mitchell*, 350 F.3d at 47). Having failed at step one, Plaintiffs may not argue that Defendants fail at step two. Defendants' motion for summary judgment is therefore granted as to Plaintiffs' FHA and state law disparate treatment claims.

### c.    Disparate Impact

Disparate impact claims are also cognizable under the FHA. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project, Inc.*, 576 U.S. 519, 545 (2015). To succeed on a disparate impact claim, "a plaintiff must first establish a prima facie case by showing, '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *Mhany Mgmt., Inc.*, 819 F.3d at 617 (quoting *Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 52–53). "[The] plaintiff need not show the defendant's action was based on any discriminatory intent." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (citing *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934–36 (2d Cir. 1988)). But the plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Inclusive Cmties. Project, Inc.*, 576 U.S. at 527 (quoting 24 C.F.R. § 100.500(c)(1) (2014)). "A plaintiff has not met its burden if it merely raises an inference of discriminatory impact." *Tsombanidis*, 352 F.3d at 575 (citing *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997)).

If the plaintiff establishes a prima facie showing, "the burden shifts to the defendant to 'prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" *Inclusive Cmties. Project, Inc.*, 576 U.S. at 527 (quoting 24 C.F.R. § 100.500(c)(2)). If the defendant makes this showing, the plaintiff may nevertheless "prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* (quoting 24 C.F.R. § 100.500(c)(3)).

"The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis*, 352 F.3d at 575. "This comparison must reveal that although neutral, the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals." *Id.* "[P]laintiffs are ordinarily required to include statistical evidence to show disparity in outcome between groups." *Id.* "Although there may be cases where statistics are not necessary, there must be some analytical mechanism to determine disproportionate impact." *Id.* at 576. "If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability." *Inclusive Cmties. Project, Inc.*, 576 U.S. at 527.

In this case, Plaintiffs challenge Defendants' facially neutral pricing policy, arguing that a report submitted by Defendants' expert, C. Paul Wazzan, "establishes that people with mobility disabilities need units in more accessible locations" and are therefore disproportionately impacted by Defendants' pricing policy, under which premium units located on the first floor and, previously, near elevators, are more expensive than other units. (Dkt. No. 181, at 60). The relevant comparison, therefore, is between handicapped and non-handicapped residents at Clover senior properties. But Wazzan, who was retained by Defendants to "calculate the number of units

that would likely be affected if Defendants were to provide discounts on ground-floor units,"

(Dkt. No. 173-5, ¶ 9), simply assumed that handicapped residents prefer these units, (Dkt. No.

183-3, ¶ 5; *see also* Dkt. No. 159-67, at 44:15–21 (testifying during his deposition that he did not

specifically analyze why demand is higher for first-floor units than for other units)). He made no

determination that handicapped residents prefer premium units to non-premium units, much less

that more handicapped residents prefer premium units than non-handicapped residents. All

residents at Clover senior properties are at least fifty-five years old and the accessibility of

premium units may be important to each of them, handicapped or not.

The Wazzan report provides no basis for comparing the impact of Defendants' pricing

policy on handicapped and non-handicapped residents—and Plaintiffs point to nothing else in the

record which might. Plaintiffs have failed to establish any statistical discrepancy in the impact of

Defendants' pricing policy, let alone one caused by the policy itself. *Inclusive Cmties. Project,*

*Inc.*, 576 U.S. at 527. As a result, no reasonable factfinder could conclude that Defendants'

facially neutral policy caused or predictably will cause "a significantly adverse or

disproportionate impact" on handicapped residents. *Mhany Mgmt., Inc.*, 819 F.3d at 617 (quoting

*Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 52–53). Most charitably, Plaintiffs have

introduced conclusory assertions that raise "an inference of discriminatory impact."

*Tsombanidis*, 352 F.3d at 575 (citing *Gamble*, 104 F.3d at 306). But this is insufficient. *Id.*

Defendants' motion for summary judgment is therefore granted as to Plaintiffs' FHA and state

law disparate impact claims.

### 2.      Property Not Owned or Managed by Defendants

Defendants also seek summary judgment on all claims related to properties "(1) not

owned or managed by a current Defendant, and/or (2) not pled in the Complaint," namely the

Contested Properties and eight properties owned by Defendant WellClover (the "WellClover Contested Properties."). (Dkt. No. 173-124, at 55–56).

Defendants argue that "Plaintiffs lack standing as to the Contested Properties because those properties are not owned or managed by Defendants" and that even assuming Plaintiffs had standing at the outset of this case "the dismissal of the owners of the Contested Properties . . . [made] Plaintiffs' claims moot as against the current Defendants." (*Id.* at 60). Plaintiffs agree that the owners of the Contested Properties are not parties. (Dkt. No. 181, at 63). But Plaintiffs are not challenging conduct by the owners; Plaintiffs are challenging conduct by the *manager*. (*Id.*). And while Defendants argue that the Contested Properties are managed by non-party Clover Management West, (Dkt. No. 173-124, at 55), Plaintiffs contend that the Contested Properties are in fact managed by Defendant Clover Management, (Dkt. No. 181, at 63). The Court observed as much in its May 2, 2024 Decision granting Plaintiffs' appeal of Magistrate Judge Lovric's order denying two motions to compel Defendants to produce information concerning the Contested Properties. (Dkt. No. 187, 9–10). In that decision, the Court noted that in the Complaint Plaintiffs name Clover Management as a Defendant and allege that Clover Management manages "all of the senior properties at issue in this matter." (*Id.* at 9 (citing Dkt. No. 1, ¶¶ 1, 24)). The Court also noted that the record includes evidence connecting Clover Management to conduct at the Contested Properties. (*Id.* at 10). Discovery into the Contested Properties is ongoing and Defendants' standing and mootness arguments miss the mark. Defendants' motion for summary judgment is denied as to claims relating to the Contested Properties.

With respect the WellClover Contested Properties, Defendants argue that "[n]o claim concerning these properties is sustainable due to the fact that Plaintiffs have not sought redress

for any alleged harm at these properties in their Complaint." (Dkt. No. 173-124, at 63). While the WellClover Contested Properties were not specifically named in the Complaint, Plaintiffs have been consistent throughout this case in alleging the implementation of discriminatory policies at all properties owned or managed by Defendants. (*See, e.g.*, Dkt. No. 1, ¶¶ 2–8). These include the five WellClover Contested Properties—Crestmount Square Senior Apartments, Sandra Lane Senior Apartments, Seneca Pointe Senior Apartments, Transit Pointe Senior Apartments, and Union Square Senior Apartments—located within the service area of HOME of Buffalo. (Dkt. No. 181-7, ¶ 5). The Court is satisfied that the Complaint put Defendants on notice of this and Defendants' motion for summary judgment as to claims relating to those five properties is denied.

Plaintiffs do not bring independent claims concerning the three other WellClover Contested Properties—Glenwood Square Senior Apartments, Huntington Square Senior Apartments, and Willoughby Hills Senior Apartment—located outside of the service area of all Organizational Plaintiffs; rather, Plaintiffs have introduced evidence of Defendants' conduct at these properties as background information. (Dkt. No. 181, at 76–77 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), for the proposition that background evidence that is not independently actionable can be used to support actionable claims). Defendants may object to such evidence in their pre-trial filings, if appropriate. But at this juncture, there are no claims relating to these three properties for the Court to rule on.

### 3. New Hartford Square Senior Apartments and Reynolds Pointe Senior Apartments

Defendants seek summary judgment on Plaintiffs' failure to accommodate claims as to New Hartford Square Senior Apartments and Reynolds Pointe Senior Apartments, arguing that Plaintiffs "submit no evidence relating to allegations of failure to provide reasonable

accommodations" at either property. (Dkt. No. 173-124, at 72). Defendants are incorrect. There

is record that Defendants' allegedly unlawful policies and practices were applied at New

Hartford Square and Reynolds Pointe, such as to two emails regarding designated parking, one

from District Manager Cynthee Defren to a recipient saved as "New Hartford Square" and the

other from District Manager Theresa Peck to numerous recipients including two saved as "New

Hartford Square" and "reynoldspointe." (Dkt. No. 159-55, at 2–3). There is also an affidavit

from Gretchen Schaefer, who was trained by CNY Fair Housing to conduct undercover testing

concerning fair housing laws. (Dkt. No. 181-16, ¶ 2). Schaefer conducted site visit tests at New

Hartford Square and Reynolds Pointe on December 5, 2018, and March 2, 2019, respectively, in

each case posing as an individual searching for an accessible first-floor or near-elevator

apartment for her mobility impaired sister. (*Id.* ¶¶ 9, 17). According to Schaefer, she was

informed at New Hartford Square that "apartments located close to the elevator were an extra

$15 per month in rent" and that "there was a one-time fee of $350 to obtain an accessible,

reserved parking spot" and at Reynolds Pointe that "with the $25 surcharge for first-floor units,

the cost would be $1,100 per month" and that handicap-accessible, reserved parking spaces

"were only for people in wheelchairs." (*Id.* ¶¶ 9–10, 17–19). The Court therefore denies

Defendants' motion for summary judgment as to Plaintiffs' New Hartford Square- and Reynolds

Pointe-related reasonable accommodation claims.

### C.      Plaintiffs' Summary Judgment Exhibits 3, 6, 12, 24, 42, and 55

Finally, Defendants argue that "Plaintiffs' summary judgment Exhibits 6, 12, 24, 42, and

55 and portions of Exhibit 3 are inadmissible and should be disregarded by the Court." (Dkt. No.

173-124, at 73). According to Defendants, Exhibit 6, (Dkt. No. 159-9), and Exhibit 12, (Dkt. No.

159-15), are expert reports that do not meet the threshold requirements of admissibility for expert

testimony; Exhibit 24, (Dkt. No. 159-27), Exhibit 42, (Dkt. No. 159-45), and Exhibit 55 (Dkt.

No. 159-58), are irrelevant documents that concern properties other than the Identified

Properties; and portions of Exhibit 3, (Dkt. No. 159-6), contain hearsay that does not fall into any

exception. (Dkt. No. 173-124, at 73, 79). Plaintiffs respond that "Defendants' arguments for

exclusion . . . are based on fundamental misunderstandings of applicable legal standards as well

as the factual record." (Dkt. No. 181, at 79).

### 1.      Exhibits 6 and 12

Exhibit 6 is an expert report submitted by one of Plaintiffs' experts, Erin Kemple, on

January 31, 2023. (Dkt. No. 159-9). Exhibit 12 is a supplemental expert report submitted by

Kemple on June 16, 2023. (Dkt. No. 159-15). Defendants argue that both exhibits are

inadmissible because they fail threshold requirements of admissibility for expert testimony. (Dkt.

No. 173-124, at 75). In support of their argument, Defendants rely on Federal Rule of Evidence

702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and caselaw precluding

experts from testifying to legal conclusions.

Defendants previously filed a motion to strike the reports and exclude the opinions of

both Kemple and Christina Brooks, Plaintiffs' other expert. (Dkt. No. 89). The Court denied that

motion in its May 8, 2024 Decision, explaining that the motion was premature and that the

parties had not adequately briefed the relevance and admissibility of some of the proposed expert

testimony. *See CNY Fair Hous., Inc. v. Wellclover Holdings LLC*, No. 21-cv-361, 2024 WL

2049047, at *2, 2024 U.S. Dist. LEXIS 83382, *3–4 (N.D.N.Y. May 8, 2024). The Court further

explained that it did not appear that the Court needed to resolve the admissibility of the expert

opinions before resolving the motions for summary judgment and that until the Court ruled on

those motions, it was not clear which, if any, theories of liability would survive summary

judgment. *Id.* (quoting *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188

(1st Cir. 1997) ("Because the summary judgment process does not conform well to the discipline

that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage.")). In fact, the Court has not relied on Exhibit 6 or 12 in deciding the parties' motions for summary judgment. Accordingly, Defendant's motion to exclude Exhibits 6 and 12 is denied as moot. Defendants may renew their objections to these exhibits in their pre-trial motions, if appropriate.

2.      **Exhibits 24, 42, and 55**

Defendants argue that Exhibits 23, 42, and 55 are irrelevant because they "concern properties other than the Identified Properties." (Dkt. No. 173-124, at 75). Plaintiffs respond that these exhibits "are relevant because they relate to the claims and theories of liability advanced by Plaintiffs." (Dkt. No. 181, at 80).

Federal Rule of Evidence 401 provides that "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. The definition of "relevance" is thus "very broad." *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014); *see also United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (describing relevance under Rule 401 as a "very low standard"). And, in general, relevant evidence is admissible. Fed. R. Evid. 402; *see United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) ("Evidence is relevant when 'it has any tendency to make a fact more or less probable than it would be without the evidence,' . . . and, unless an exception applies, all '[r]elevant evidence is admissible.'" (alteration in original) (quoting Fed. R. Evid. 401, 402)).

In the Complaint, Plaintiffs name Clover Management as a Defendant. (Dkt. No. 1, ¶ 1). Plaintiffs allege FHA violations at numerous properties—not just the Identified Properties. (*Id.*). And Plaintiffs allege that Clover Management manages "all of the senior properties at issue in this matter." (*Id.* ¶ 24). Exhibits 24, 42, and 55 tend to make that fact more likely. Exhibit 24 is a

lease renewal agreement for an apartment at Huntington Square Senior Apartments in Ohio, which includes the line: "Professionally managed by Clover Management, Inc." (*See* Dkt. 159-27). Exhibit 42 is an affidavit from Megan Confer-Hammond, Executive Director of Plaintiff Fair Housing Partnership, describing the organization's testing practices and authenticating testing documents related to reasonable accommodation tests at Clover properties in its service area. (*See* Dkt. No. 159-45). And Exhibit 55 is an email chain between employees at the Willoughby Hills Apartments in Ohio and Clover Management executives Kenneth Knox and Emily Brady in which the parties discuss how to respond to a reasonable accommodation request for parking from a resident. (*See* Dkt. No. 159-58). Accordingly, the Court declines to exclude this evidence.

### 3.    Exhibit 3

Exhibit 3 is a transcript containing excerpts of a deposition given by Joyce Wilcox on November 3, 2023. (Dkt. No. 159-6). Wilcox is Lois Harter's niece and the administrator and representative of her estate. Wilcox replaced Harter in this action after Harter died in September 2022. Defendants argues that several statements made by Wilcox are inadmissible for purposes of Plaintiffs' motion for summary judgment because they contain inadmissible hearsay. (Dkt. No. 173-124, at 79). The Court has not relied on these portions of Exhibit 3 in deciding the parties' motions for summary judgment and, as a result, Defendants' motion is denied as moot. Again, Defendants may renew their objections to this exhibit in their pre-trial motions, if appropriate.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs' motion for summary judgment, (Dkt. No. 159), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment, (Dkt. No. 159), is **GRANTED** with regard to the Individual Plaintiffs' parking-related reasonable accommodation claims under the FHA and NYSHRL; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment, (Dkt. No. 159), is otherwise **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 173), is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 173), is **GRANTED** with regard to Plaintiffs' rent-related disparate treatment and disparate impact claims under the FHA, the NYSHRL, and Ohio Civil Rights Law and **GRANTED** with regard to Plaintiff Town's rent-related reasonable accommodation claim under the FHA and the NYSHRL; and it is further

**ORDERED** that Defendants' motion for summary judgment, (Dkt. No. 173), is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: June 24, 2024
         Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge